No. 59,742

STATE OF KANSAS, *Appellee*, v. RON CATHEY, *Appellant.*

(741 P.2d 738)

Opinion filed July 17, 1987.

*Rosanne Piatt*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the briefs for appellant.

*Gordon B. Stull*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Ron Cathey appeals his convictions of one count of aggravated battery (K.S.A. 21-3414) and one count of attempted first-degree murder (K.S.A. 21-3401). Cathey makes numerous claims, among them that the trial judge improperly admitted hearsay evidence violating his constitutional right of confrontation and that the trial judge improperly instructed the jury. We reverse and remand for a new trial.

On Saturday evening, September 7, 1985, in Pratt, Kansas, Kaycee Wheeler, accompanied by a girlfriend, Nora Parsons, asked Michael Bowers (the victim) to spend the night with her at her mother's home. Enroute to the mother's home, the three observed that Mark Cathey's car had hit a parked car.

Earlier that evening, Mark Cathey, the defendant's brother,

had been drinking with Kaycee Wheeler, Nora Parsons, and Travis Parr, another boyfriend of Wheeler's, at a local restaurant. Mark behaved boisterously.

Later that night, after he had parted company with his drinking companions, Mark Cathey used his car in an attempt to run another car, occupied by David Bishop and Jim Wenrich, off the road. A fight ensued. Mark was hit several times in the face. Soon after the fight, an off-duty police officer observed Mark Cathey's blue Camaro hit a parked car. Mark abandoned his car and ran from the scene of the accident.

Around midnight, Mark's brothers, Floyd Cathey and the defendant, Ron Cathey, were at Mark's house with their girlfriends. Mark, battered and bloodied, suddenly entered his house by the back door. After reporting to the group that he had been in a fight and a car accident, Mark exited through the front door. Immediately thereafter, the police arrived looking for Mark because he had left the scene of the accident.

After the police departed, Ron and Floyd went to look for Mark. They found Mark and took him to Floyd's girlfriend's house. Ron and Floyd then departed to find the person who had "done this to their brother." Unable to locate an assailant, they returned and asked a confused Mark what had occurred. Ron and Floyd believed Mark's reply to be that Wheeler's boyfriend, Michael Bowers, had beaten him. They left to locate Bowers and avenge their brother's beating.

At approximately 9:00 a.m. on Sunday, the police were sent to investigate the report of a naked man lying in a back yard. They found the man, later identified as Michael Bowers, lying in the back yard of Wheeler's mother's home, unconscious and breathing irregularly. Bowers had been both shot below the left eye and beaten. Bowers was unable to remember anything after having been pulled out of the back door of Wheeler's mother's home by his assailant and was unable to identify his assailant. Both Ron and Floyd left for Colorado early that morning. Ron returned to Pratt two days later.

Law enforcement officers initially suspected that Floyd Cathey was the assailant. During the investigation of the crime, Janet Moore, Floyd Cathey's girlfriend, gave statements to KBI agents on September 9 and September 16, 1985. She later tes-

tified at two inquisitions held on November 1, 1985. Janet Moore maintained that she knew nothing about the shooting of Michael Bowers, Ron Cathey was also subpoenaed and testified at the inquisition on November 1, 1985.

On November 22, 1985, Moore's sister, Nancy Jackson, gave inquisition testimony. After testifying, Nancy located Moore and informed Moore that perjury charges were pending against her. Later, Moore was given immunity by the prosecution for any perjury she had committed during the prior inquisitions. On November 25, Moore gave additional inquisition testimony which refuted her first statements. Moore testified that when Ron and Floyd returned to her house, they said "they just blew somebody away." She stated that when she asked Floyd if he had done it, Floyd responded, "No, Ron shot him." Moore was later charged with aiding and abetting and was placed on diversion.

On November 25, 1985, Ron Cathey was arrested for the shooting of Michael Bowers. On June 11, 1986, he was convicted in a jury trial on one count of aggravated battery and one count of attempted murder. Janet Moore testified for the prosecution. Cathey appeals his convictions, raising numerous issues.

Cathey's initial claim is that the charges of aggravated battery and attempted first-degree murder are multiplicitous, and, therefore, his convictions violate K.S.A. 1986 Supp. 21-3107(2) which states:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following: . . . (d) a crime necessarily proved if the crime charged were proved."

Multiplicity is the charging of two or more counts in a complaint where only a single criminal act is involved. *State v. Garnes*, 229 Kan. 368, 372, 624 P.2d 448 (1981); *State v. Dorsey*, 224 Kan. 152, 578 P.2d 261 (1978). K.S.A. 1986 Supp. 21-3107(1) allows charging an individual with multiple violations arising from a single transaction when the same conduct may establish the commission of more than one crime.

The principles for determining whether charges are multiplicitous are: (1) A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution. (2) If each

offense charged requires proof of a fact not required in proving the other, the offenses do not merge. (3) Where offenses are committed separately and severally, at different times and at different places, they cannot be said to arise out of a single wrongful act. *State v. Garnes,* 229 Kan. at 373.

In *Garnes,* we considered the multiplicity of charges of aggravated battery and attempted murder. Garnes was charged with Count I, aggravated battery by shooting; Count II, aggravated battery by stabbing; and Count IV, attempted murder. The victim had been shot, then placed in a car and driven to a field. There she was robbed, taken out of the car, stabbed, run over by the car, abandoned, and left to die. Garnes argued, as does Cathey, that the charges in Count I, the shooting, and Count II, the stabbing, were multiplicitous with Count IV, attempted murder, because the facts formed one continuous series of events. It was determined that, since the shooting relied upon in Count I occurred at an earlier time and place than the other criminal acts, it was a separate and distinct offense and was not multiplicitous with Count IV. However, since the stabbing in Count II occurred contemporaneously with running over the victim and leaving her to die, the aggravated battery by stabbing charge was multiplicitous with the charge of attempted murder.

The multiplicity of charges of aggravated battery and attempted first-degree murder was also considered in *State v. Turbeville,* 235 Kan. 993, 686 P.2d 138 (1984). There, since the only overt act was the shooting of the victim, basing both the aggravated battery and the attempted first-degree murder charges on a single act of shooting was clearly multiplicitous.

Here, we do not have two acts separated by the passage of time as in *Garnes,* nor do we have one act which has formed the basis of two separate charges as in *Turbeville.* The State argues that, though there was only one victim, there were two separate acts of violence—a beating and a shooting—and the person who inflicts such injuries can be charged with aggravated battery and attempted murder. We disagree. Where there is only one victim and two acts of violence—a beating and a shooting—occurring at approximately the same time and place, the person who inflicts such injuries cannot be charged with both aggravated battery and attempted murder. To hold otherwise would be inconsistent

with our reasoning in *Garnes* that when a series of violent acts occurs simultaneously, it is multiplicitous to charge both aggravated battery and attempted first-degree murder.

Cathey's next claim is that by admitting his inquisition statement, the trial court violated his Fifth and Sixth Amendment rights. We disagree.

The Kansas inquisition procedure is an investigatory tool available only to the attorney general, his assistant, or the county or district attorney. Though most often used to determine whether probable cause exists to support a criminal prosecution, an inquisition may also be conducted to obtain additional evidence from the same or other witnesses after a suspect has been bound over for trial. *State v. Hobson* 234 Kan. 133, 143, 671 P.2d 1365 (1983).

Prior to being charged, Cathey was subpoenaed to give testimony at an inquisition held November 1, 1985. As is required by K.S.A. 22-3102 and K.S.A. 22-3104, Cathey was informed before testifying that he had the right to counsel and the right to refuse to answer any questions that were self-incriminating. Cathey stated that he understood the warning and that if he felt he needed an attorney at any time, he would request one. Cathey's inquisition statement was later introduced into evidence during his trial.

Cathey claims that, since his inquisition statement was derived from a custodial interrogation, it was involuntary and should not have been admitted into evidence at trial. *Miranda v. Arizona*, 384 U.S. 436, 478, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

The basis for admissibility of a defendant's custodial statement into evidence at trial is whether the individual gave the statement voluntarily after knowingly and intelligently waiving his constitutional rights. Cathey argues that, since his appearance at the inquisition was required by subpoena and his statement was made under threat of contempt, such appearance equates with custodial interrogation, requiring that he be informed of his constitutional rights as per *Miranda*.

A pretrial statement by an accused is involuntary if elicited either through coercion or derived from a custodial interrogation without the benefit of the *Miranda* warnings and a knowing and

intelligent waiver of the privilege against self-incrimination. *State v. Mooney*, 10 Kan. App. 477, 480, 702 P.2d 328 (1985), citing *Miranda v. Arizona*. We have often recognized that there is a distinction between custodial and investigatory interrogation. *State v. Taylor*, 234 Kan. 401, 405, 673 P.2d 1140 (1983). Custodial interrogation is the questioning of persons by law enforcement officers, initiated and conducted while such persons are held in legal custody or are otherwise deprived of their freedom of action in any significant way. Investigatory interrogation is the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way. *State v. Price*, 233 Kan. 706, 712, 664 P.2d 869 (1983).

Cathey reasons that if a witness in an inquisition is subsequently charged with a crime within the scope of the inquiry, that witness' statement cannot later be introduced into evidence. He asserts that because individuals summoned to testify at an inquisition are subject to contempt charges for non-appearance or failing to testify, significant restraints on their freedom exist. Thus restrained, individuals later charged with a crime must be given the *Miranda* warning rather than the required statutory warnings.

We do not agree with Cathey's reasoning. The statutory warnings are fully adequate to protect the constitutional rights of a witness who, after giving a statement, is later charged with a crime. An inquisition, K.S.A. 22-3101 *et seq.*, equates with routine questioning of witnesses by law enforcement officers during an investigation of a possible crime. Both are inquiries to determine if a crime has been committed and to obtain information sufficient to charge the perpetrator of the crime. The legal distinction is that the inquisition procedure provides a county attorney, a district attorney, or the attorney general or assistant attorney general with the power to have witnesses appear at the inquisition and testify under oath.

Although the witness' presence at the inquisition is compelled, the witness' self-incriminating statements are not. Nor are there any physical restraints on the witness' freedom. An individual who fails to appear after being summoned or refuses

to give a non-incriminating statement is subject to civil contempt, not criminal punishment. Under such circumstances, a warning under *Miranda* is not constitutionally required. K.S.A. 22-3104's statutory safeguards are fully adequate to protect an inquisition witness' constitutional rights, even where that witness is subsequently accused of committing the crime under investigation. The trial judge did not err when he refused to suppress the defendant's inquisition statement.

Cathey also contends that because his inquisition statement was not taken in the presence of a district judge, it could not later be admitted into evidence. The trial judge ruled that an inquisition is not required to be held in the presence of a judge.

The former inquisition statute, G.S. 1949, 62-301, provided:

"If a county attorney, attorney general, or assistant attorney general shall be notified by any officer or other person, or shall have knowledge of any violation of any law of this state relating to gambling, intoxicating liquors, or of any violation of any law where the accused is a fugitive from justice, it shall be his duty forthwith diligently *to inquire into the facts of such offense,* and for that purpose he is hereby authorized to issue subpoenas for such persons as he shall have any reason to believe have any information concerning, or knowledge of such offense, to appear before him, at a time and place to be designated in the subpoena, then and there to testify concerning any offense against the laws of the state; or said county attorney, attorney general or assistant attorney general may file with the *judge of the district court, a judge of the city court, or with some justice of the peace of the county,* a written statement signed by him, alleging any offense against the laws of this state and such judge or justice of the peace shall, on the written praecipe of the county attorney, attorney general or assistant attorney general, issue a subpoena·for the witnesses named in such praecipe, *commanding such witnesses to be and appear before such judge or justice of the peace* at a time stated in such subpoena, to testify concerning any offense against the laws of the state." (Emphasis added.)

This statute was amended in 1970 and replaced by K.S.A. 22-3101. K.S.A. 22-3101 (1) provides as follows:

"**22-3101. Inquisitions; witnesses.** (1) If the attorney general, an assistant attorney general, or the county attorney of any county is informed or has knowledge of any alleged violation of the laws of Kansas, such person may apply to a district judge to conduct an inquisition. An application for an inquisition shall be in writing, verified under oath, setting forth the alleged violation of law. Upon the filing of the application, the judge with whom it is filed shall, on the written praecipe of the attorney general, assistant attorney general or county attorney, issue a subpoena for the witnesses named in such praecipe commanding them to appear and testify concerning the matters under investigation. Such

subpoenas shall be served and returned as subpoenas for witnesses in criminal cases in the district court."

Defendant points to the Judicial Council note following the inquisition statutes, which states:

"Judicial Council, 1969: Former Kansas statutes provided for two general types of inquisition proceedings:
   (a)   In cases involving alleged violations of the laws relating to gambling or intoxicating liquors or where the accused is a fugitive from justice, the county attorney or attorney general may, upon his own initiative, call and examine witnesses. In such instances the presence of a judge or magistrate is not required.
   (b)   In cases not included in (a) above, the county attorney may file a statement before a judge or magistrate alleging violations of law and cause the judge to subpoena witnesses for interrogation. In this case, the examination of witnesses must be in the presence of the judge or magistrate.
This article retains essentially the provisions of the former law except that when the inquisition is conducted before a judicial officer it must be conducted before a district judge. The inquisition may intrude upon sensitive areas, involving self-incrimination, privileged communications, grants of immunity, and other important rights of the witness called to testify. Hence, the section provides for counsel to advise the witness concerning his testimony.
Except for the matters noted, this section is substantially like the prior law."

We disagree with Cathey and the conclusion reached by the Judicial Council. An inquisition is in effect a one-person grand jury which provides the attorney general, his assistant, or any county or district attorney with authority to inquire into alleged violations of the law. If the alleged violations pertain to racketeering, bribery, tampering with a sports contest, narcotics or dangerous drugs, or any violation of the law where the accused is a fugitive from justice, the officer conducting the inquisition may issue subpoenas compelling individuals to appear and testify without judicial intervention. K.S.A. 22-3101(2). All other inquiries of alleged crimes require the investigating officer to file a written verified application with a district judge to obtain subpoenas for witnesses to appear and give testimony at an inquisition. If, after reviewing the application for an inquisition, the district judge determines that the application is legally defective, to avoid abuse of judicial process, the district judge has the authority to refuse to issue subpoenas. *State ex rel. Cranford v. Bishop*, 230 Kan. 799, 640 P.2d 1271 (1982).

Neither the attorney general, his assistant, the county or district attorney, nor the foreman of the grand jury has contempt power to enforce orders. If a person disobeys a subpoena to appear, refuses to be sworn as a witness, or refuses to answer proper questions before the grand jury or at an inquisition, only a judge has the power of contempt to enforce compliance with the order. A witness who fails to comply with a lawful request of the grand jury or a lawful request of the officer conducting an inquisition is brought before the judge and the judge then determines whether the witness is to be found in contempt and civilly punished for failure to comply with a lawful request.

When a grand jury is conducting an investigation into alleged violations of the law, the judge is also required to perform certain statutory duties, but the judge does not participate in the investigation or attend or conduct the meetings of the grand jury. By deleting the requirement that the inquisition be conducted in the presence of a judge, the legislature intended that the inquisition procedure conform to the procedure of the grand jury.

The fundamental rule of statutory construction, to which all other rules are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statutes. When a statute is plain and unambiguous the court must give effect to the intention of the legislature as expressed. *Johnson v. McArthur*, 226 Kan. 128, 135, 596 P.2d 148 (1979). The plain language of K.S.A. 22-3101 provides for two types of inquisition procedures. The first requires application to a district judge for the issuance of subpoenas, the second does not; however, as in the grand jury hearings, the taking of a witness' statement during an inquisition does not require the actual presence of a district judge. The defendant's contention is without merit.

Defendant also cites *State v. Hobson*, 234 Kan. 133, for the proposition that inquisition statements are never admissible at trial. *Hobson* merely stated that the deposition statute, K.S.A. 22-3211, provides a method to preserve testimony in the event a "material witness" will be unavailable for trial. To insure that the accused's right of confrontation is not violated, the statute sets forth strict rules under which such testimony may be admitted as evidence at the accused's trial. The inquisition statutes, on

the other hand, are designed to permit the county or district attorney or attorney general to subpoena and question witnesses in order to investigate criminal matters and the extent of the accused's involvement in such activities. This testimony is not admissible at trial. 234 Kan. at 144.

Our statement in *Hobson* is consistent with the holding in *State v. Phifer*, 241 Kan. 233, 737 P.2d 1 (1987), that, where a witness is not available to testify at the accused's trial, the transcript of the witness' testimony given at a hearing on a motion to suppress is barred from being introduced into evidence in a criminal trial as an exception to the hearsay rule. In a criminal case, K.S.A. 1986 Supp. 60-460 bars all hearsay statements of unavailable witnesses except those statements taken pursuant to the deposition statute and the testimony transcribed at the preliminary examination. Since there is no confrontation problem, neither *Hobson* nor *Phifer* applies to a defendant's statements taken at an inquisition.

Defendant further contends that, because he did not sign his statement, the trial court's admission of his inquisition statement violated K.S.A. 22-3101(3), which provides:

"Each witness shall be sworn to make true answers to all questions propounded to him or her touching the matters under investigation. The testimony of each witness shall be reduced to writing and signed by the witness."

After reading the transcript of his testimony at the inquisition, Cathey refused to sign the transcript. Neither at trial nor on appeal did Cathey claim that his refusal to sign the transcript of the inquisition was based on the fact that it inaccurately reflected his statement. Cathey first stated that he refused to sign the statement, upon the advice of his attorney, because his attorney objected to its use at trial. To now argue that the statement was inadmissible because he did not sign it is circular reasoning not permitted or contemplated by the statute. Clearly, a defendant may not prevent the use at trial of otherwise admissible testimony by simply refusing to sign the inquisition statement.

The purpose of having a witness sign the inquisition statement is twofold. First, the individual who signs the statement is identified as the person who gave the statement. Second, the individual is afforded the opportunity to review his statement and correct any errors that occurred in the transcription of the

statement. Under proper circumstances, an accused's unsigned inquisition statement may be admitted into evidence. Cathey's contention that his unsigned inquisition statement could not be admitted into evidence in his trial is without merit.

Janet Moore gave inquisition testimony twice on November 1, 1985. After this, Janet told her sister, Nancy Jackson, that she had lied at the inquisition to protect her boyfriend, Floyd Cathey. Concerned for her sister, Nancy then placed a call to Crimestoppers. Subsequently, Nancy Jackson and her husband, Jack, were subpoenaed for an inquisition statement on November 22, 1985. After this inquisition, Nancy told her sister, Janet, that perjury charges were pending against Janet for statements given in the inquisitions on November 1, 1985. Janet was then offered immunity by the State for perjury she might have committed in the inquisitions of November 1, 1985. On November 25, 1985, Janet Moore gave another inquisition statement. Charges against the defendant were filed on the same date. Janet Moore's testimony at trial conformed with her last inquisition testimony.

Cathey argues that the grant of immunity to Janet Moore for prior perjury violates his Fourteenth Amendment rights and K.S.A. 22-3415, which provides:

"22-3415. **Laws applicable to witnesses; immunity from prosecution or punishment.** The provisions of law in civil cases relative to compelling the attendance and testimony of witnesses, their examination, the administration of oaths and affirmations, and proceedings as for contempt, to enforce the remedies and protect the rights of the parties, shall extend to criminal cases so far as they are in their nature applicable, unless other provision is made by statute.

The county or district attorney or the attorney general may at any time, on behalf of the state, grant in writing to any person immunity from prosecution or punishment on account of any transaction or matter contained in any statement or about which such person shall be compelled to testify and such statement or testimony shall not be used against such person in any prosecution for a crime under the laws of Kansas or any municipal ordinance. After being granted immunity from prosecution or punishment, as herein provided, no person shall be excused from testifying on the ground that his testimony may incriminate him unless such testimony is a violation of federal law. He shall not be granted immunity from prosecution for perjury or false statement or any other crime committed in giving such evidence."

The statute clearly states that the prosecutor may grant immunity from prosecution to a witness for any matter revealed in a statement the witness is compelled to make. The last sentence of

the statute indicates that once immunity from prosecution has been granted, and the witness testifies, that witness may not be granted further immunity from prosecution for perjury for that testimony.

Defendant cites *State v. Bryant*, 228 Kan. 239, 613 P.2d 1348 (1980), for the proposition that the statute precludes the State from granting immunity for perjury. Defendant's reliance is misplaced. In *Bryant*, defendant made a motion for a new trial based on newly discovered evidence. The basis for the motion was the alleged recanted testimony of a key witness, the codefendant. Both Bryant and the codefendant had already received immunity in exchange for testifying about the other's participation in the crime. At the hearing on Bryant's motion for a new trial, the codefendant refused to testify, claiming his privilege under the Fifth Amendment. By testifying, the codefendant would have admitted his earlier perjury. In rejecting Bryant's argument that the State could or should have offered the codefendant immunity, we held that such a grant of immunity for perjury committed *while already testifying under a grant of immunity* was precluded by the statute. 228 Kan. at 247.

The Court of Appeals has also recently addressed this issue in *State v. Brewer*, 11 Kan. App. 2d 655, 732 P.2d 780, *rev. denied* 241 Kan. 839 (1987). In holding that the State did not err in granting immunity for perjury committed at the defendant's preliminary hearing, the Court of Appeals correctly determined that *Bryant* solely forbids a grant of immunity for perjury committed while testifying under a grant of immunity. 11 Kan. App. 2d at 659 (citing *United States v. Alter*, 482 F.2d 1016, 1028 [9th Cir. 1973]).

The case at hand is clearly distinguishable. There was no attempt to grant Janet Moore immunity for perjured testimony given while already under a grant of immunity. The State only granted immunity for her prior inquisition testimony for which no earlier immunity had been granted and such is clearly not precluded by the statute.

Cathey next contends that his Sixth Amendment right to confront the witnesses against him was violated when, under K.S.A. 1986 Supp. 60-460(d)(3), the trial court admitted the out-of-court statements of three witnesses given to a KBI agent five days after

the crime. The witnesses were the defendant's cousin and two brothers of defendant's girlfriend.

The testimony of the three witnesses, as related by the KBI agent, was essentially that both Floyd and Ron Cathey were at an E-Z Shop around 2:00 a.m. on Sunday, September 8, 1985. Both Floyd and Ron told the witnesses that their brother Mark had been beaten up, that they were angry about it, and that they were going out to "get his ass." Two of the witnesses stated that Floyd Cathey had a gun in his pocket.

To admit hearsay statements under 60-460(d)(3), the trial court must find (1) the declarant is unavailable as a witness; (2) the matter described was recently perceived by the declarant and the statement made while his memory was fresh; and (3) the statement was made under circumstances so as to show that it was in good faith, before there was an action pending, and with no incentive to falsify or distort. 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d), p. 240 (1979). The trial court is necessarily given considerable discretion in admitting statements under this exception. Vernon's Kansas C. Civ. Proc. § 60-460(d) (1965); 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d) (1979). In *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.2d 684 (1974), we held that under this provision the presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances. See *State v. Hobson*, 234 Kan. at 158; *State v. Brown*, 220 Kan. 684, 688, 556 P.2d 443 (1976).

However, the factors enumerated in K.S.A. 1986 Supp. 60-460(d)(3) must be balanced by the requirements of the confrontation clause of the Sixth Amendment. The right of the accused to confront the witnesses against him is a fundamental right, essential to a fair trial, and is made obligatory on the states by the Fourteenth Amendment. The major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime the opportunity to cross-examine the witnesses against him. *Pointer v. Texas*, 380 U.S. 400, 403-04, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965).

Prior to admission of the hearsay, Cathey's attorney claimed he would be unable to cross-examine the missing witnesses. The trial judge replied:

"But that isn't the test really after reading the statute. The test is whether or not the events were so recently perceived and whether his memory is fresh."

After a later objection by the defendant, the trial court stated:

"I find that the declarant is unavailable as a witness. That the matter described was—have [sic] been recently perceived by the declarant. That he made the statement to Agent Burns while his memory was fresh. The statement was made under circumstances to show that it was made in good faith, before there was an action pending and certainly he had no incentive to falsify or distort these statements made about his friend, so I'm going to admit them."

The trial judge did not consider the constitutional requirement of the right of confrontation.

Our hearsay rules and the Sixth Amendment's confrontation clause are generally designed to protect similar values and stem from the same roots. If the witness is unavailable, the confrontation clause requires that the otherwise admissible hearsay statements must be shown to have an adequate "indicia of reliability." After a showing that the hearsay statement has particularized guarantees of trustworthiness, the statement may be admitted into evidence. *Ohio v. Roberts*, 448 U.S. 56, 65-66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), *State v. Myatt*, 237 Kan. 17, 697 P.2d 836 (1985).

The rule against admission of hearsay statements stems from the long-established belief that cross-examination is the best vehicle for discovering the truth and that the most reliable statements come from the witness stand. The trial judge did not require the State to provide any foundation of reliability for the admission of the witness' hearsay testimony. Failure of the State to show that the absent witness' statements had a particularized guarantee of trustworthiness violated the confrontation clause of the Sixth Amendment.

Cathey's final claim is that the trial judge erred when he instructed the jury that it could consider the defendant's alleged flight in determining guilt or innocence.

The instruction in question reads as follows:

### "INSTRUCTION NO. 19

"If you find from the evidence that the defendant, soon after the commission of the alleged offense, fled to avoid arrest and trial, you may take that fact into consideration in determining his guilt or innocence. Flight, if such occurred, is not sufficient in itself to establish guilt, and if such flight is not explained to the

satisfaction of the jury then it is a circumstance which you may consider in determining the possibilities of the defendant's guilt or innocence. The weight to which that circumstance is entitled is a matter for the jury to determine in connection with all the facts in the case."

Evidence to establish the defendant's consciousness of guilt such as flight, concealment, fabrication of evidence, or the giving of false information is admissible as evidence in a criminal case. However, in *State v. McCorgary*, 218 Kan. 358, 365, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867 (1976), this court disapproved instructing the jury regarding flight because the trial judge thereby emphasized and singled out certain evidence admitted at a criminal trial. We directed that, in any subsequent trial of McCorgary, the entire instruction on consciousness of guilt be omitted from the instructions to the jury. This insures that the weight of all evidence is left to the jury and special emphasis is not to be given in the instructions. See *State v. Jones*, 3 Kan. App. 2d 553, 598 P.2d 192 (1979).

The State argues that Instruction No. 19 was proper because it was counterbalanced by Instruction No. 11, which stated:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

The State cites *Jones* for the proposition that the giving of an instruction similar to Instruction No. 11 may somehow cure an improper instruction. The State's reliance on *Jones* is misplaced. The court in *Jones* found that the giving of the instruction was harmless error because the instruction in question, stating that a person may be under the influence of alcohol "even though he may walk straight or give no visible signs of intoxication to the casual observer," was no "grave departure" from the accepted form of approved instruction. 3 Kan. App. 2d at 555.

The purpose of instructing the jury is to guide the jurors in their deliberations and to aid them in arriving at a legally proper verdict. It is the trial judge's duty to explain to the jury the law of the case and to point out the elements necessary to be proved by the State in a criminal case. Instructions which are erroneous and misleading can constitute grounds for a new trial. When instructing a jury, a trial judge may not single out and give undue

emphasis to particular evidence, even though the instruction states the correct principle of law.

It is clearly erroneous for a judge to instruct the jury on a defendant's consciousness of guilt by flight, concealment, fabrication of evidence, or the giving of false information. Such an instruction singles out and particularly emphasizes the weight to be given to that evidence by the jury. The flight instruction was clearly a grave departure from the accepted form. By giving the flight instruction, the trial judge violated the *McCorgary* prohibition. This violation and other trial errors require that Cathey's conviction be reversed and the case be remanded for a new trial in accordance with this opinion.

Reversed and remanded for a new trial.