(250 P.3d 286)
No. 102,478

STATE OF KANSAS, *Appellant*, v. RODNEY L. TURNER, *Appellee*.

Opinion filed April 22, 2011.

*Jerome A. Gorman,* district attorney, and *Steve Six,* attorney general, for appellant.

*James L. Eisenbrandt* and *Christina M. DiGirolamo,* of Berkowitz Oliver Williams Shaw & Eisenbrandt, LLP, of Kansas City, Missouri, and Prairie Village, and *Arthur A. Benson II,* of Law Offices Arthur Benson & Associates, for appellee.

Before BUSER, P.J., MALONE and STANDRIDGE, JJ.

MALONE, J.: In March 2008, pursuant to a citizen-filed petition under K.S.A. 22-3001(2), the district court of Wyandotte County impaneled a grand jury to investigate allegations of criminal activity by the Board of Public Utilities (BPU) of the Unified Government of Wyandotte County/Kansas City, Kansas. After 6 months of hearings, the grand jury returned an indictment against Rodney Turner for 2 counts of theft and 55 counts of presenting a false claim. Turner filed a motion to dismiss the indictment for abuse of the grand jury, and the district court granted the motion. The State appeals the dismissal of the indictment and Turner cross-appeals, seeking clarification of whether the dismissal was with or without prejudice. For the reasons set forth herein, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 9, 2008, Thomas Reardon submitted a petition to the District Court of Wyandotte County, calling for a grand jury pursuant to K.S.A. 22-3001(2). The grand jury was convened on March 5, 2008, to investigate the allegations in the petition. The petition alleged:

"BPU bought 3 houses in Piper and 3 friends/good old' boys lived in for free, NO rent, utilities or taxes. (Exposed by TV 5).

"Misappropriation of Public Funds by BPU management and elected board members. Evidenced by the credit card receipts (Pitch newspaper)

"Utility rate fixing is against the law. BPU Utility Rates fluxuate [sic] with the General Manager and Board Directors mood. 2007 before the BPU Election for Board Members rates were the highest in the metro area. During the election rates were the lowest in the metro. After the election rates have returned to the highest in Metro.

"Electric Rates from 2001 to 2006 have raised 71% & Water Rates are up 155%

"Our **non-profit** BPU Utility in 2006 raised the incoming revenue $36.5 million and claimed $14.5 million in profit. This profit results from over charging us the owners.

"BPU no-bid contracts and fixing with possible bribery charges should be investigated.

"Wind Power was a no bid contract and without an engineering study. Board vote 6-0

"Falsifing [sic] reports, as to the EPA that involve environmental disregard to public safety is a felony. (KC Star Newspaper) The BPU failed to report 73 projects in violation Under Clean Air Act Section 114(a), 42 U.S.C. () 7414(a) & 40 C.F.R. Part 52

"Falsifing [sic] Reports as appraised values or appraised value tampering."

The grand jury met periodically for 6 months, heard testimony from at least 27 witnesses, and examined 97 exhibits. Jerome A. Gorman and Kristiane Gray of the Wyandotte County District Attorney's office presented evidence to the grand jury. Special Agent William Delaney of the Kansas Bureau of Investigation (KBI) was assigned to investigate matters for the grand jury. Delaney testified in front of the grand jury multiple times.

As its investigation developed, the grand jury heard testimony regarding Turner, who had reportedly performed legal work for the BPU. Turner had submitted invoices for legal services to the BPU that were not itemized, and questions arose over what specific legal services Turner had performed for the BPU. The amount of the invoices exceeded $370,000. The grand jury called Turner to testify, and he responded in writing that he planned to invoke his Fifth Amendment rights and not answer any questions. The grand jury did not release Turner from the subpoena. Turner appeared before the grand jury and invoked the Fifth Amendment, refusing to answer over 120 questions. On August 27, 2008, the grand jury indicted Turner for 2 counts of felony theft and 55 felony counts of presenting a false claim.

Marc Conklin, who had been legal counsel, chief administrative officer, and human resource manager at the BPU, was also indicted. On March 6, 2009, Turner and Conklin filed a joint motion to dismiss the indictments for grand jury abuse and violation of rights. In the motion, they argued that the grand jury was biased by Delaney's testimony that implied Turner and Conklin were connected to the unsolved murder of Chuck Thompson, which had occurred 20 years earlier. Thompson was a local politician and attorney in Wyandotte County who was murdered in 1987. According to Delaney, many of the same names involved in the ongoing Thompson murder investigation kept coming up in the BPU investigation. Turner and Conklin also complained that the State violated their constitutional rights by requiring them to appear before the grand jury after knowing they would exercise their Fifth Amendment rights and would not waive any attorney-client privilege the BPU asserted. Finally, Turner argued that it was improper for Delaney to comment to the grand jury that Turner should come forward with information about the Thompson murder and about Turner's relationship with the BPU.

On or about March 25, 2009, Conklin died and the district court subsequently dismissed him from the case. The hearing on Turner's motion to dismiss commenced on April 28, 2009. At the hearing, Turner claimed his Fifth Amendment rights were violated (1) when Delaney commented to the grand jury about whether Turner would testify; (2) when Turner was called to testify in front of the grand jury after telling the prosecutor he was invoking his Fifth Amendment rights; and (3) when, after Turner's appearance before the grand jury, Delaney commented on Turner's silence, effectively stating that if Turner had an explanation for the legal bills in question, he should give that explanation to the grand jury. Additionally, Turner argued there was abuse of the grand jury. He claimed that Delaney's "constant insertion" of the Thompson murder investigation into the grand jury proceedings was improper, as Delaney wanted to obtain an indictment of Turner to use as leverage in the Thompson murder investigation.

The State denied abuse of the grand jury, emphasizing the procedural differences between federal and Kansas grand juries, es-

pecially Kansas grand juries impaneled to investigate allegations in a citizen's petition. The State argued that many of Delaney's comments about the Thompson murder investigation were provided to the grand jury as background information concerning Delaney's previous involvement with the BPU. The State further argued that the grand jury's indictment of Turner was based on the many exhibits admitted into evidence and the testimony of witnesses from the BPU, and not based on Delaney's comments about the Thompson murder investigation. Furthermore, the State contended that under Kansas law it did not violate Turner's Fifth Amendment rights by requiring him to invoke those rights in front of the grand jury on a question-by-question basis.

After hearing from both parties, the district court found that the State and Delaney had undermined the grand jury process to the point of depriving Turner of due process and his Fifth Amendment rights. Specifically, the district court found that the grand jury was repeatedly subjected to highly improper and prejudicial comments by Delaney that attempted to link Turner to the Thompson murder investigation. Additionally, the district court found that the State violated Turner's Fifth Amendment rights by (1) calling Turner to appear after knowing he would exercise his Fifth Amendment rights and (2) permitting Delaney to infringe upon Turner's Fifth Amendment rights by commenting on Turner's silence in front of the grand jury. The district court found that the "State failed to conduct a fair grand jury proceeding and allowed information to be presented to the grand jury in a manner that caused the grand jury to become prejudiced against Defendant Turner." Therefore, the district court granted Turner's motion to dismiss the indictment. When asked by counsel, the district court refused to specify whether the dismissal was with or without prejudice. The State timely appealed the district court's decision dismissing the indictment. Turner filed a cross-appeal seeking clarification of whether the dismissal was with or without prejudice.

On appeal, the State claims the district court erred by granting Turner's motion to dismiss the indictment. The State contends that under Kansas law it did not violate Turner's Fifth Amendment rights by requiring him to invoke those rights in front of the grand

jury on a question-by-question basis. The State argues that Delaney's comments on Turner's silence did not violate Turner's constitutional rights. The State also argues that many of Delaney's comments about the Thompson murder investigation were provided to the grand jury as background information concerning Delany's previous involvement with the BPU. The State further argues that the grand jury's indictment of Turner was based on the many exhibits admitted into evidence and the testimony of witnesses from the BPU, and not based on Delaney's comments about the Thompson murder investigation. The State argues that in granting Turner's motion to dismiss the indictment, the district court abused its discretion by relying entirely on the transcript excerpts attached to the motion instead of reading all the transcripts of the entire grand jury proceedings. Finally, the State urges this court to adopt the federal rule that a grand jury indictment should only be dismissed when actual prejudice can be shown.

There are no Kansas cases stating the appropriate standard of review for dismissal of an indictment based on grand jury abuse. The State argues that this court should exercise unlimited review, and the State attempts to liken this case to one reviewing a district court's dismissal of an information or complaint because of insufficient evidence, which is reviewed de novo. See *State v. Berg*, 270 Kan. 237, 237-38, 13 P.3d 914 (2000) (reviewing de novo the dismissal of a complaint because the State failed to establish probable cause at the preliminary hearing). Turner, on the other hand, argues for an abuse of discretion standard of review, citing *State v. Boehmer*, 41 Kan. App. 2d 598, 602, 203 P.3d 1274 (2009), which reviewed a district court's dismissal with prejudice of criminal charges for an abuse of discretion.

Judicial discretion will vary depending upon the character of the question presented for determination. Generally, a district court's decision is protected if reasonable persons could differ about the propriety of the decision, as long as the discretionary decision was made within and takes into account any applicable legal standards. However, an abuse of discretion may be found if a district court's decision goes outside the framework of or fails to properly consider statutory limitations or legal standards. *State v. Woodward*, 288

Kan. 297, 299, 202 P.3d 15 (2009). Sometimes, abuse of discretion standards are more accurately characterized as questions of law requiring de novo review. An abuse of discretion standard does not mean that a mistake of law cannot be corrected by an appellate court. Rather, a district court necessarily abuses its discretion when it makes an error of law. Under the abuse of discretion standard, an appellate court reviews whether the district court's discretion was guided by erroneous legal conclusions. *State v. Moore,* 287 Kan. 121, 135, 194 P.3d 18 (2008). Under this appropriate framework, we will review the district court's decision to dismiss the indictment against Turner for an abuse of discretion.

We begin by outlining the basic statutory structure of grand jury proceedings in Kansas. A grand jury may be summoned based upon a citizen-filed petition pursuant to K.S.A. 22-3001(2). Additionally, a district court may order a grand jury to be summoned in any county in the district when it is determined to be in the public interest. K.S.A. 22-3001(1). The grand jury shall consist of 15 members pursuant to K.S.A. 22-3001(3). After a grand jury is impaneled, a district court appoints a presiding juror and a deputy presiding juror pursuant to K.S.A. 22-3004. Oaths are administered pursuant to K.S.A. 22-3003. Once the grand jury is impaneled and sworn, a district judge charges the jurors, giving them "such information as he deems proper and is required by law, as to their duties, as to any charges of crimes known to the court and likely to come before the grand jury." K.S.A. 22-3005(1). After the grand jury is charged, however, "it shall retire to a private room, and inquire into the crimes cognizable by it." K.S.A 22-3005(2).

A grand jury is an investigative body. Significantly, a grand jury may be impaneled to investigate specific allegations of criminal conduct, but the process often leads the grand jury to different but related areas of investigation. The grand jury is neither supervised nor conducted by the court; therefore, the rules of evidence do not apply. See *Tiller v. Corrigan,* 286 Kan. 30, 40-42, 182 P.3d 719 (2008) (discussing the unique role of a grand jury and the United States Supreme Court's recognition that a grand jury's " 'operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials' ").

Kansas grand jury proceedings are quite different than criminal or civil trials.

"In Kansas, a grand jury is a creature of statute and not of the constitution. Its function is investigatory and accusatory in contrast to a petit jury, which determines the guilt or innocence of an accused. Unlike a jury trial or preliminary hearing, a district judge does not preside over the grand jury proceedings, nor does a defendant have a right to be present or call or cross-examine witnesses. The county attorney has a limited role in the grand jury proceedings, and . . . has no responsibility to make a record or ensure that the jurors are qualified." *State v. Snodgrass*, 267 Kan. 185, 190, 979 P.2d 664 (1999).

We will now address the reasons cited by the district court for dismissing the grand jury indictment. The State admits on appeal that had some of the errors upon which Turner based his motion to dismiss occurred during a jury trial, the errors would have required a reversal of any conviction. However, the State argues that these same errors did not warrant dismissal of the indictment because the errors occurred before a grand jury, not a petit jury charged with returning a verdict of guilty or not guilty.

## TURNER'S FIFTH AMENDMENT RIGHTS

### Calling Turner to Testify

The State argues that the district court erred by finding it was improper for the prosecutor to ask Turner questions in front of the grand jury after knowing that Turner would invoke his Fifth Amendment rights. The district court found that "[t]he State and its investigative officer undermined the grand jury process and deprived Mr. Turner of due process and his Fifth Amendment rights." More specifically, the district court stated that "[t]he State caused Mr. Turner to appear before the grand jury even though it knew that he would exercise his Fifth Amendment rights . . . ."

The State points to K.S.A. 22-3008(3), which mandates the proper procedure "[i]f any witness appearing before a grand jury refuses to testify or to answer any questions asked in the course of the witness' examination," and K.S.A. 22-3008(4), which provides that "[n]o witness before a grand jury shall be required to incriminate the witness' self." In addition, K.S.A. 22-3009(1) states that "[a]ny person called to testify before a grand jury must be informed

that he has a right to be advised by counsel," while K.S.A. 22-3009(2) allows counsel for any witness to be present while that witness testifies and to object on the witness' behalf. Based on these statutory provisions, the State contends it did not violate Turner's Fifth Amendment rights by requiring him to invoke those rights in front of the grand jury on a question-by-question basis.

However, Turner claims his rights were violated when, after telling the Wyandotte County District Attorney that he was invoking his Fifth Amendment rights, he was not released from his subpoena to testify. Turner argues that his position is supported by K.S.A. 60-423(a), which states: "Every person has in any criminal action in which he or she is an accused a privilege not to be called as a witness and not to testify." But Turner's argument is undermined by the fact that a grand jury proceeding is not a criminal action but an investigatory proceeding and at the time of Turner's testimony, he was not an accused but a witness testifying before the grand jury. See *State v. Nott*, 234 Kan. 34, 48, 669 P.2d 660 (1983) (grand jury proceeding is "essentially investigative" in nature).

There is no Kansas case that directly addresses the propriety of calling and questioning a grand jury witness who has previously informed a prosecutor of his or her intention to invoke the protections of the Fifth Amendment. However, there is Kansas case law on this issue in the context of an inquisition. The Kansas Supreme Court has previously stated that "[a]n inquisition is in effect a one-person grand jury which provides the attorney general, his assistant, or any county or district attorney with authority to inquire into alleged violations of the law." *State v. Cathey*, 241 Kan. 715, 723, 741 P.2d 738 (1987), *disapproved on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). Due to the similarities between an inquisition and a grand jury proceeding, the analysis of a witness' Fifth Amendment rights in the context of an inquisition is applicable to a grand jury proceeding as well.

*In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 932 P.2d 1023 (1997), involved an appeal by a witness at an inquisition following the death of a 16-month-old child in Wyandotte County. One of the issues on appeal was whether the district court

erred in "refusing to allow the witness to assert a blanket Fifth Amendment right to silence at the inquisition." 23 Kan. App. 2d at 472. The witness in *T.H.* argued for a blanket Fifth Amendment right to remain silent and cited the same statutory prohibition upon which Turner is relying here, *i.e.* an accused in a criminal case cannot be forced to testify. See K.S.A. 60-423(a).

The *T.H.* court began by examining K.S.A. 22-3102 which provided: "No person called as a witness at an inquisition shall be required to make any statement which will incriminate him." The court found that although a witness cannot be compelled to make an incriminating statement, this statute contemplated that a person who might make an incriminating statement may still be called as a witness. 23 Kan. App. 2d at 475. The court also noted that pursuant to K.S.A. 22-3104, any witness at an inquisition must be informed of his or her right to counsel and that counsel for any witness may be present during the testimony and may object on behalf of the witness. 23 Kan. App. 2d at 475. After examining Kansas case law that found the statutory safeguards of Fifth Amendment rights in an inquisition were fully adequate, the *T.H.* court held:

"Based on the statutory language and the interpretive case law which is available, this court finds that a person called as a witness in an inquisition under K.S.A. 22-3101 *et seq.* is not provided blanket immunity from answering questions, and the district court correctly required the witness to assert a Fifth Amendment right on a question-by-question basis." 23 Kan. App. 2d at 475.

The statutes governing the inquisition in *T.H.* are nearly identical to the current statutes governing grand jury proceedings. K.S.A. 22-3008(4) provides that "[n]o witness before a grand jury shall be required to incriminate the witness' self." K.S.A. 22-3008(5) grants the county or district attorney, the attorney general, and the district judge authority to grant immunity to witnesses in order to compel testimony which would otherwise be privileged as self-incriminating. K.S.A. 22-3009 mandates that a grand jury witness must be informed of his or her right to counsel and that counsel for any witness may be present during testimony and may object on behalf of the witness but may not examine or cross-examine any witness before the grand jury.

As in *T.H.*, the statutes here contemplate grand jury witnesses who may make incriminating statements, but the statutes also contemplate that a person who might make an incriminating statement may still be called as a witness. We also note that just prior· to Turner's testimony, the district court instructed the grand jury that "[t]he Grand Jury shall not draw any inference of guilt from the fact that a [witness] does not testify or refused to answer particular questions. You must not consider these facts in arriving at your decision regarding any indictment." Thus, to the extent that Turner may have been prejudiced by being required to invoke his Fifth Amendment rights in front of the grand jury, the grand jurors had been properly instructed not to draw any inference of guilt from Turner's silence.

Based on the decision in *T.H.* as well as the language of K.S.A. 22-3008 and 22-3009, we conclude the State did not violate Turner's Fifth Amendment rights by requiring him to invoke those rights in front of the grand jury on a question-by-question basis. Accordingly, the district court erred by finding it was improper for the prosecutor to ask Turner questions in front of the grand jury after knowing that Turner would invoke his Fifth Amendment rights. Likewise, the district court erred by granting Turner's motion to dismiss the indictment based in part on this reason.

### *Delaney's Comments on Turner's Silence*

According to Turner, his Fifth Amendment rights were also violated when, before Turner was called to testify, Delaney commented on his belief that Turner would not appear before the grand jury and testify. Additionally, Turner argues that Delaney improperly commented on Turner's silence after his grand jury appearance. The district court agreed, finding: "During the grand jury proceeding, the State's investigator was permitted to cast doubt on Mr. Turner's constitutional rights by commenting that Mr. Turner should come forward with information about the Thompson murder and about his dealings with the BPU."

In his motion before the district court, Turner gave three examples of Delaney's comments on Turner's silence before Turner appeared before the grand jury. First, on April 2, 2008, Delaney

testified to the grand jury that "I would think [Turner] would be able to justify why he's submitting those bills to the BPU." Second, on April 16, 2008, a grand juror asked Delaney if he had any suggestions as to specific areas the grand jury should focus on as the grand jury tried to narrow its investigation. After listing other areas on which to focus, Delaney said, "I think you ought to bring Rod Turner in. I don't think that he will talk. I don't know." The third challenged comment occurred when the district attorney asked Delaney whether he had any reason to disbelieve Reardon's allegations. In response, Delaney stated that he had no reason to disbelieve Reardon, even though some of his statements had not been corroborated. Delaney further stated, "And I mean you hear something about Rod Turner. You just don't go to Rod Turner and say, 'Hey, is this true?' Because, you know, I told you we tried talking to him on another case and he didn't see a need to talk to us, so I'll be shocked if he comes in and talks to you."

Turner also points to a comment Delaney made after Turner appeared before the grand jury and invoked his Fifth Amendment right to remain silent. On July 30, 2008, Delaney testified, "[I]f [Turner has] proof of what he's doing for the BPU why doesn't he show it to us, or why doesn't he show it to you. That's just an opinion of mine. I'm not a lawyer. I'm just a cop."

Turner is correct in stating that Delaney's comments on Turner's silence would have been impermissible during a criminal trial. The United States Supreme Court has held that, at trial, "[t]he use for impeachment purposes of petitioners' silence, at the time of the arrest and after they received *Miranda* warnings, violated the due process clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). This holding was adopted in Kansas in *State v. Mims*, 220 Kan. 726, Syl. ¶ 1, 556 P.2d 387 (1976). In addition to its holding in *Doyle*, however, the United States Supreme Court has held that a prosecutor *may* use a defendant's pre-arrest silence to impeach the defendant at trial. *Jenkins v. Anderson*, 447 U.S. 238, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980).

However, *Doyle* and *Jenkins* are not directly applicable here, because the allegedly improper commentary on Turner's silence

did not take place as part of a jury trial. At the time Turner invoked his Fifth Amendment right and refused to testify, he had not been arrested, he was not a defendant, and no one was attempting to impeach him at trial. Instead, all of the conduct occurred as part of grand jury proceedings, and there is no direct legal authority for the proposition that a comment by a witness to a Kansas grand jury about another witness' silence at a grand jury is improper, much less a violation of constitutional rights.

Nevertheless, although the rules of evidence do not technically apply to a grand jury proceeding, we conclude that Delaney's comment on Turner's refusal to testify, after he had expressly invoked his right to remain silent, violated his constitutional rights under the Fifth Amendment. At the time Delaney made this comment, the district court already had instructed the grand jury to not consider the fact that Turner refused to testify in arriving at a decision regarding the indictment. In light of this instruction, Delaney's comment on Turner invoking his right to remain silent was clearly improper. Whether Turner has shown that he was prejudiced by Delaney's comment and whether this comment undermined the independence of the grand jury sufficient to warrant dismissal of the indictment will be addressed by this court later in the opinion.

### Abuse of the Grand Jury

The district court granted Turner's motion to dismiss the indictment based also on abuse of the grand jury. Specifically, the district court found that the "State failed to conduct a fair grand jury proceeding and allowed information to be presented to the grand jury in a manner that caused the grand jury to become prejudiced against Defendant. Turner." Turner's argument, both in district court and on appeal, centers on comments Delaney made in front of the grand jury regarding the 1987 murder of Chuck Thompson, a local politician and attorney in Wyandotte County. According to Delaney, many of the same names involved in the ongoing Thompson murder investigation kept coming up in the BPU investigation.

The State first argues that in granting the motion to dismiss, the district court abused its discretion by relying entirely on the tran-

script excerpts attached to Turner's motion instead of reading all the transcripts of the entire grand jury proceedings. At the hearing on Turner's motion to dismiss, the State argued that many of Delaney's comments about the Thompson murder investigation were provided to the grand jury as background information concerning Delaney's previous involvement with the BPU. The State further argued that the grand jury's indictment of Turner was based on the many exhibits admitted into evidence and the testimony of witnesses from the BPU, and not based on Delaney's comments about the Thompson murder investigation. The State asked the district court to read all the transcripts of the entire grand jury proceedings, in order to put Delaney's comments into the proper context.

At the hearing, the district judge acknowledged that he had not read all the transcripts of the entire grand jury proceedings. However, immediately at the end of the hearing, the judge proceeded to rule on the motion to dismiss, finding that the State had "undermined the grand jury process" and that Delaney's comments about the Thompson murder investigation had "tainted the grand jury." The judge presumably made these findings based on the exhibits attached to Turner's motion to dismiss. These exhibits included 44 pages of Delaney's testimony before the grand jury. The grand jury proceedings lasted 6 months and the grand jury transcripts included in the record on appeal consist of over 1,900 pages.

Generally, "[j]udicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. [Citation omitted.]" *State v. Gant*, 288 Kan. 76, 81-82, 201 P.3d 673 (2009). We agree with the State that it constituted an abuse of discretion for the district court to find that the State "failed to conduct a fair grand jury proceeding" without reading all the transcripts of the entire grand jury proceedings. We do not understand how the district court could have properly concluded that Delaney's testimony "tainted the grand jury" without reading the entirety of the grand jury proceedings. Furthermore, it was unreasonable and arbitrary for the district court to make a determination of the general char-

acter of the grand jury proceeding as biased or unfair without having knowledge of the full context of Delaney's testimony or the other evidence presented at the grand jury.

Although the district court did not review all the transcripts of the entire grand jury proceedings prior to dismissing the indictment, we have made the effort to do so on appeal. There is no question that Delaney's testimony contains multiple references to his involvement in the Thompson murder investigation. All of these references were irrelevant and unnecessary to the grand jury's investigation of Turner and the BPU. However, as the State points out, many of Delaney's comments about the Thompson murder investigation were provided to the grand jury as background information concerning Delaney's previous involvement with the BPU. Delaney testified before the grand jury on nine separate occasions over a 6-month period, and only at one session was the Thompson murder investigation discussed at length. At no time did Delaney state that Turner was responsible for Thompson's murder. The most incriminating reference Delaney made about the Thompson murder investigation occurred in his testimony on April 16, 2008. On that date, Delaney was asked by a juror about the Thompson murder investigation and Delaney responded as follows:

"[Juror] 419001: In your heart you mentioned the murder at Jalisco. In your heart, do you think there is any kind of relationship here?

"[Agent Delaney:] As I told you the first time I testified or when I testified about that issue, some of the same names in that case are coming up today. I will leave it at that. Murder is—there is never a statute of limitations and I have been working on it for 20 years and, you know, sometimes people get in a bind and get charged or indicted and they want to cooperate. Sometimes that will help us. I always look for that road too.

"[Juror] 419001: That is still open?

"[Agent Delaney:] Yes, is very open.

"[Juror] 419001: If something comes out of this you can charge somebody?

"[Agent Delaney:] If something would come out of this or I mean, I actually think I know who did it and why, but to present it to 12 people, I don't know that we're ready, so."

Turner contends that Delaney wanted to obtain an indictment of Turner to use as leverage in the Thompson murder investigation. While we agree with Turner that any reference to the Thompson murder investigation was completely irrelevant to the grand jury proceedings, it does not necessarily follow that such irrelevant testimony was sufficient to warrant a dismissal of the grand jury indictment. The district court failed to specify the legal authority for dismissal of the indictment based upon grand jury abuse other than making a general reference to Turner's due process rights. We believe that in order to determine whether Delaney's improper testimony was sufficient to warrant a dismissal of the indictment, a court must first consider the nature of Turner's due process rights in the grand jury proceedings. Second, a court must consider the extent by which Turner's due process rights were prejudiced by the improper testimony.

We will first consider the nature of Turner's due process rights in the grand jury proceedings. Although there is no Kansas case on point, the Wyoming Supreme Court examined the nature and attachment of due process rights in the context of grand jury proceedings in *Hennigan v. State*, 746 P.2d 360 (Wyo. 1987). In *Hennigan*, the defendant was indicted on and convicted of four counts of delivery of marijuana. On appeal, the defendant claimed that the manner in which the grand jury was conducted resulted in a deprivation of due process. Among other complaints, the defendant alleged that the grand jury was improperly impaneled and the proceedings lacked any indicia of reliability in determining probable cause.

In addressing the defendant's complaints, the *Hennigan* court noted that the purpose of the grand jury was to assure that there was probable cause to present an individual to a petit jury for trial. The court also noted that although the failure to observe fundamental fairness in a trial context is a denial of due process, the defendant had not provided any controlling legal authority to support his position that due process rights attach in a grand jury proceeding in the same manner as in a criminal trial. Ultimately, after analyzing the grand jury statutes in Wyoming and the restricted bases for review of evidence in a grand jury proceeding,

the court held that the procedure followed by the grand jury that resulted in the defendant's indictment did not deny the defendant due process of law. 746 P.2d at 370-74.

*Hennigan* stands for the proposition that due process rights do not attach in a grand jury proceeding in the same manner as in a criminal trial. Here, it appears that the district court analogized Turner's due process rights in the grand jury proceedings under the same scrutiny as his rights in a criminal trial. The State concedes that some of the errors committed in Turner's grand jury proceedings may have been sufficient to reverse a conviction had the same errors occurred in a trial. However, just as the defendant in *Hennigan,* Turner has failed to provide this court with any controlling legal authority to support his position that due process rights attach in a grand jury proceeding in the same manner as in a criminal trial.

We next consider the extent by which Turner's due process rights were prejudiced by the improper testimony in the grand jury proceedings. Prejudice plays a large role in determining whether a due process violation occurred in the context of criminal proceedings. Without the possibility of an unfair consequence such as denial of the right to a fair trial, a defendant's due process rights generally are not deemed to be violated. See, *e.g.*, *State v. Reed*, 282 Kan. 272, 276-77, 144 P.3d 677 (2006) (concluding that in order to establish a due process violation, the appellant must demonstrate prejudice).

In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), the United States Supreme Court addressed the issue of prejudice in the context of errors in federal grand jury proceedings. In that case, a 20-month investigation conducted before two successive grand juries resulted in a 27-count indictment against multiple defendants. Ultimately, the district court dismissed all 27 counts due to various violations of federal rules of criminal procedure, and because dismissal was proper under the totality of the circumstances. According to the district court, the government knowingly presented misinformation to the grand jury, witnesses were mistreated, and the defendant's

rights under the Fifth and Sixth Amendments to the United States Constitution were violated.

On review, the Supreme Court held: "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." 487 U.S. at 254. However, the Supreme Court allowed a presumption of prejudice where "the structural protections of the grand jury [have] been so compromised as to render the proceedings fundamentally unfair." 487 U.S. at 257. According to the Supreme Court, examples of structural error creating a presumption of prejudice include racial discrimination in the selection of grand jurors and the purposeful exclusion of women from a grand jury. 487 U.S. at 257.

Ultimately, the Supreme Court found that it was error for the district court to have dismissed the indictments, in spite of the fact that the prosecutor committed multiple errors throughout the grand jury proceedings, including administering unauthorized oaths to IRS agents; allowing IRS agents to give misleading and inaccurate summaries of testimony to the grand jury; abusing an expert defense witness in the presence of some grand jurors; granting "pocket immunity" to 23 grand jury witnesses; and permitting two IRS agents to appear before the grand jury at the same time. 487 U.S. at 260-63. In determining the prejudicial effect of these actions, the Supreme Court noted that the incidents "occurred as isolated episodes" over the course of a long investigation involving dozens of witnesses and thousands of documents. 487 U.S. at 263. Viewed in that context, the Supreme Court determined that the violations did not have "a substantial effect on the grand jury's decision" to indict. 487 U.S. at 263. Further, the Supreme Court found that "[e]rrors of the kind alleged in these cases can be remedied adequately by means other than dismissal," suggesting punishment through contempt of court, a court order to show cause why a prosecutor should not be disciplined, or chastisement of a prosecutor in a published opinion. 487 U.S. at 263.

As in the *Bank of Nova Scotia* case, the errors alleged in the grand jury proceedings that culminated in Turner's indictment occurred as isolated episodes over the course of a 6-month investi-

gation involving at least 27 witnesses and 97 exhibits. In the absence of structural error affecting the makeup of the grand jury, which is not present in this case, we must conduct a prejudice analysis in order to determine whether the improper testimony in Turner's grand jury proceedings was sufficient to warrant a dismissal of the indictment. In order to weigh the prejudicial effect of the improper testimony, we will summarize the evidence that was presented during the grand jury proceedings to support Turner's indictment.

On March 12, 2008, Harold Walker, chief legal counsel for the BPU, testified before the grand jury. Walker testified that the BPU had its own general counsel, who was subordinate to Walker on legal matters while taking day-to-day administrative instruction from the BPU's general manager. According to Walker, the BPU's general counsel needed to obtain Walker's approval before hiring outside law firms or lawyers to perform legal work for the BPU. Walker also testified that although Turner had a contract with the BPU, as far as Walker knew, Turner had undertaken "no traditional legal services" for the BPU. Walker's testimony was corroborated by the testimony of Rick Yarnell, the former Director of Internal Audit and Performance Assurance at the BPU.

On April 9, 2008, Edward Gillette, an attorney who had previously shared office space with Turner, testified before the grand jury that he had never seen Turner go to court to represent the BPU in the more than 20 years he had known Turner. Furthermore, Gillette testified: "To my knowledge I've never seen Turner practice law in the time that I've known him, and that's been a long time." Gillette testified that in normal legal billing, an attorney should document the work performed and present an itemized statement.

Also on April 9, 2008, Mary Gonzalez, a previous president of the board of the BPU, testified that she was not aware of Turner ever presenting legal work to the board or appearing before the board. Gonzalez was not aware of any reports to the board that would indicate what type of legal work Turner performed for the board. The grand jury also heard testimony from multiple other board members who testified they had never seen any evidence

presented to the board that Turner performed legal work for the BPU.

On April 16, 2008, Carolyn O'Reilly testified before the grand jury. Prior to her retirement in 2006, O'Reilly had worked as executive assistant to the general manager of the BPU for 9 years, and her job duties included processing requests for payment. When asked what services Turner had performed for the BPU, O'Reilly did not know. O'Reilly testified that there was no documentation submitted to specifically show what legal work Turner had performed, nor did she ever see any evidence of any legal work Turner had performed for the BPU.

On May 14, 2008, Gerianne Williams, who succeeded O'Reilly as the executive assistant to the general manager, testified before the grand jury. Williams testified that she never saw any memos or correspondence related to any issues or legal matters Turner handled for the BPU. She further testified that Turner's legal bills did not come through the mail, as did the other legal bills. According to Williams, Turner's legal bills came directly from Conklin, and she suspected Conklin was printing Turner's bills for him.

On July 2, 2008, Ernest Leon Daggett, who had been the BPU general manager from 1995 to 2005, testified that he had never given Turner a legal assignment, nor had he ever seen a contract for Turner's representation of the BPU. Don Gray, the general manager of the BPU after December 2005, testified that he had never received an explanation as to any specific legal matter Turner handled for the BPU. Gray was not aware of any contract between Turner and the BPU or any issues on which Turner was representing the BPU. Gray testified that he approached Conklin "several times" and asked what Turner was doing for the BPU, and Conklin assured him that "he was providing good legal counsel" on "utility affairs."

Finally, and most importantly, the grand jury examined Exhibit Number 21, which consisted of 5 years of invoices from Turner and the corresponding purchase orders generated by the BPU. The amounts of the invoices exceeded $370,000, but the invoices failed to itemize any legal work actually performed by Turner for the BPU. Matt Barberich, a forensic CPA, testified that the invoices

should have raised questions for the BPU because the invoices did not support the amounts that were being billed.

Thus, substantial evidence was presented before the grand jury to support probable cause for Turner's indictment. Turner presented invoices to the BPU that were not itemized, which the grand jury reviewed, for legal services exceeding $370,000. However, no officer or employee of the BPU was aware of any legal services that Turner actually performed for the BPU. There was a clear inference from the evidence that Conklin was overseeing substantial payments to Turner for legal work that Turner never performed for the BPU. In light of this substantial evidence, it seems unlikely that Delaney's improper testimony had "a substantial effect on the grand jury's decision" to indict Turner. *Bank of Nova Scotia,* 487 U.S. at 263. Accordingly, Turner is unable to establish prejudice caused by any errors in the grand jury proceedings.

In summary, we conclude the district court erred by finding that the State violated Turner's Fifth Amendment rights by requiring him to invoke those rights in front of the grand jury on a question-by-question basis. However, we agree with the district court that it was improper for Delaney to comment on Turner's silence after he had appeared before the grand jury and expressly invoked his Fifth Amendment rights. We also agree with the district court that Delaney's testimony included multiple references to Thompson's 20-year-old murder investigation that were completely irrelevant to the grand jury proceedings. However, in light of the fact that due process rights do not attach in grand jury proceedings in the same manner as in a criminal trial, and in light of the fact that Turner is unable to show that he was prejudiced by the improper statements, we conclude the errors in the grand jury proceedings did not warrant the district court's decision to dismiss the indictment against Turner. There was substantial evidence presented during the grand jury proceedings to support probable cause for the indictment. Turner's constitutional rights can be protected at trial by suppressing any evidence of the Thompson murder investigation and by prohibiting the prosecutor and any witnesses from commenting on Turner's right to remain silent.

For all these reasons, we conclude the district court erred by granting Turner's motion to dismiss the indictment. Turner has filed a cross-appeal, seeking clarification of whether the district court's dismissal of the indictment was with or without prejudice. The district court specifically refused to specify whether the dismissal was with or without prejudice. Thus, there is no district court decision for this court to review. In light of our decision to reverse the district court's dismissal of the indictment and remand for further proceedings, we will not address Turner's cross-appeal.

Reversed and remanded.