IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 102,478

STATE OF KANSAS,
*Appellant/Cross-appellee*,

v.

RODNEY L. TURNER,
*Appellee/Cross-appellant*.

SYLLABUS BY THE COURT

1.

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and § 10 of the Kansas Constitution Bill of Rights guarantee that a person shall not be compelled in a criminal case to be a witness against himself or herself. The constitutional right against self-incrimination means that no person shall be compelled to answer official questions put to him or her in any proceedings—civil or criminal, formal or informal—where the answers might incriminate that person in future criminal proceedings.

2.

For witnesses appearing before a grand jury, K.S.A. 22-3008(4) specifically codifies the constitutional right against self-incrimination in those proceedings.

3.

Unless the district court determines, pursuant to K.S.A. 22-3008(3), that a grand jury witness claiming the right against self-incrimination is bound to answer a particular question, a prosecutor commits constitutional error by continuing to question the witness

1

in front of the grand jury after the witness has unequivocally invoked his or her rights against self-incrimination.

4.

In this case, a Kansas Bureau of Investigation agent acting as chief investigator for the grand jury and a witness called by the prosecutor violated the constitutional and statutory rights against self-incrimination of another grand jury witness who had unequivocally and successfully invoked his rights against self-incrimination when the agent testified that the grand jury should draw an adverse inference from the witness' silence.

5.

The Fifth and Fourteenth Amendments to the United States Constitution protect an individual's due process rights and prohibit the deprivation of a significant life, liberty, or property interest. The target of a grand jury investigation has a significant liberty interest at stake and is entitled to due process protection. The essence of due process is fairness between the State and the individual dealing with the State. A State's administration of justice is subject to proscription under the Due Process Clause of the Fourteenth Amendment to the United States Constitution if it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

6.

Kansas statutes governing grand jury proceedings contemplate the due process mandate that an indictment should issue only where it is based on legal evidence, rather than suspicion or conjecture.

7.

Once the accused in an indictment has established the existence of constitutional violations and abuse of process in the grand jury proceedings, the State, as the party benefitted by the errors, carries the burden to establish that the errors were harmless.

8.

A district court has the authority to dismiss a grand jury indictment if the accused was prejudiced by misconduct during the proceedings. The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict. If violations did substantially influence the grand jury's decision to indict, or if there is grave doubt as to whether the decision to indict was free from such substantial influence, the violations or errors cannot be deemed harmless.

Review of the judgment of the Court of Appeals in 45 Kan. App. 2d 744, 250 P.3d 286 (2011). Appeal from Wyandotte District Court; JACK L. LIVELY, judge. Opinion filed September 5, 2014. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Jerome A. Gorman*, district attorney, argued the cause, and *Steve Six*, attorney general, was with him on the briefs for appellant/cross-appellee.

*James L. Eisenbrandt*, of Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, of Kansas City, Missouri, argued the cause, and *Christina M. DiGirolamo*, of the same firm, and *Arthur A. Benson II*, pro hac vice, of Law Offices of Arthur Benson & Associates, of Kansas City, Missouri, were with him on the briefs for appellee/cross-appellant.

*Daniel E. Monnat*, of Monnat & Spurrier, Chtd., of Wichita, was on the brief for amicus Kansas Association of Criminal Defense Lawyers.

The opinion of the court was delivered by

3

JOHNSON, J.: Rodney Turner seeks review of the Court of Appeals decision that reversed the district court's dismissal of a multiple-count indictment returned against him by a citizen-initiated grand jury. The petition to convene the grand jury alleged wrongdoing by the officers and directors of the Board of Public Utilities (BPU) of the Unified Government of Wyandotte County/Kansas City, Kansas (Unified Government). Turner, an attorney who did consulting and legal work for BPU, was indicted by the grand jury on 2 counts of theft and 55 counts of presenting a false claim, based upon the theory that he had not performed the work for which he had submitted monthly invoices to the BPU.

The district court granted Turner's motion to dismiss the indictment, finding that Turner had been prejudiced by grand jury abuses and violations of his constitutional rights. But the Court of Appeals reversed the dismissal, finding that Turner did not possess the full panoply of constitutional rights at the investigatory proceedings by the grand jury and that the constitutional violations that did occur during the grand jury proceedings did not prejudice Turner because the record contained sufficient evidence to establish probable cause to support the indictments. *State v. Turner*, 45 Kan. App. 2d 744, 250 P.3d 286 (2011). Because the record before us establishes grave doubt that the grand jury's decision to indict was free from the substantial influence of the abuses of process and constitutional violations caused by the State's agents during the grand jury proceedings, we reverse the Court of Appeals and affirm the district court's dismissal of the indictment.

FACTUAL AND PROCEDURAL OVERVIEW

In January 2008, T.J. Reardon filed a petition to summon a grand jury in the District Court of Wyandotte County for the purpose of investigating claims relating to the

4

BPU and Unified Government. The petition set forth allegations that BPU executives and directors, as well as city and county officials, had violated the law and misappropriated public funds in various ways. The petition did not specifically refer to Turner or allude to the consulting and legal work that he performed for BPU, albeit one of the statements in the petition directed that "BPU no-bid contracts and fixing with possible bribery charges should be investigated."

The grand jury was convened in March 2008. The Court of Appeals referred to the grand jury proceedings as "a 6-month investigation," 44 Kan. App. 2d at 761-62, but the record indicates that the grand jury actually convened 17 times between its first meeting on March 5, 2008, and its last session on August 27, 2008; *i.e.*, the grand jury averaged approximately 3 days in session per month. Wyandotte County District Attorney Jerome Gorman (DA) and Assistant District Attorney Kristiane Gray (ADA) presented evidence, examined witnesses, and provided legal advice during the grand jury proceedings. Special Agent William Delaney of the Kansas Bureau of Investigation (KBI) was assigned to investigate matters for the grand jury and played an integral role in the proceedings, testifying before the grand jury on 10 of the 17 days it was in session. The agent often advocated for an indictment against Turner, at times intimating that such an indictment might lead to a resolution of an unrelated 20-year-old murder case.

During his appearance on the first day of the proceedings, Delaney directed the grand jury's attention toward Turner by characterizing his consulting and legal work arrangement with BPU as an example of a "no-bid contract" to which the petition had referred. Subsequently, the grand jury would be presented evidence that from 2003 through 2008, Turner had submitted monthly invoices to BPU that totaled in the neighborhood of $400,000. The invoices were routinely approved by both the general counsel and the general manager of BPU, notwithstanding that they contained only the number of hours worked and the hourly rate, without a detailed itemization of the nature

5

of work performed. The general counsel, Marc Conklin, was also a target of the investigation.

The State called several witnesses, including two former executive assistants to BPU's general manager, two Board members, and an attorney who was acquainted with Turner, to testify that they did not know the nature of the work that Turner had actually performed for BPU. But other Board members, including the Board's secretary, testified about the nature of Turner's work for BPU of which they were aware, as did the former general manager of BPU who served from 1995 to 2005. The current BPU general manager opined that the amount of money paid to Turner was not out of line in comparison with what BPU spent on attorney fees and that he had accepted the general counsel's explanation that Turner "was offering a lot of legal advice and counsel to [the general counsel] and that [the general counsel] valued [Turner's] legal opinions."

At that first grand jury session, in response to a juror's question about when the agent had begun his BPU investigation, Delaney referred to a 20-year-old murder case that remained open. Delaney added that he remained interested in "BPU people because of some interest in another case that I probably can't discuss or shouldn't discuss on this Grand Jury."

Nevertheless, at the next session, Delaney told the grand jury that he had been "concerned and interested in BPU because some of the people that we were hearing were involved in the BPU we thought were involved in a murder case in Wyandotte County." Delaney then told the grand jury about that murder case, namely that Chuck Thompson, a local politician and attorney, was murdered in December 1987, and the case remained unsolved. Delaney further related that he was again approached in 2005 to do an investigation of BPU and that Turner's name continued to come up on both the BPU

6

investigation and the Thompson murder. The agent spoke of doing interviews on the "Thompson case/BPU case" and tied Turner to both cases by telling the grand jury:

> "[Y]ou guys know, that there is some kind of legal work or some kind of work being done by Rod Turner I think over a period of 2003 to 2005. I think I saw the figures over $400,000 worth of work. All we've seen is invoices. I would be interested to see what's behind those invoices, what's causing those invoices, 40 hours a week at $150 an hour. He's got—I would think he would be able to justify why he's submitting those bills to the BPU.
>
> "I think that's a very interesting area that you really ought to look at pretty closely. Again, we have an interest in Turner because supposedly he had information about this other case."

The agent went on to intimate that Turner was a dangerous person by telling the grand jury he had warned Reardon, the instigator of the grand jury petition, that he was "dealing with people that you need to be concerned about, don't put yourself in a position where you can become like a Chuck Thompson."

When the grand jurors were provided an opportunity to ask their own questions of Delaney, the following exchange took place:

> "GRAND JUROR 392119: On the Chuck Thompson, I'm not even going to ask you to get into detail there. I don't think it's fair or relevant. But are you finding it easier to tie this all together?
>
> "[DELANEY]: Some of the same names that came up in that have come up in this. And it's always been the people that probably weren't directly involved but people that are behind the scenes. That's the information, without getting in a lot of detail on the homicide, but these same names are coming up.
>
> . . . .
>
> "GRAND JUROR 406292: If we get Rod Turner in here and ask him about the $400, and is there something else—something else you might be licking your chops on?

7

"[DELANEY]:  He wouldn't talk to us about the homicide. I would like to talk to him about the homicide, but I don't think he would be cooperative."

Delaney concluded his testimony at the April 2 session by reiterating that his agenda was to "solve the Thompson murder and help resolve the BPU issues if possible. And somewhere in between we'll find the right mix hopefully." He said that whenever he interviews someone on the BPU matter, he always asks about the Chuck Thompson murder.

Delaney next appeared two sessions later, on April 16, and provided an update on his witness interviews, after which the following exchange occurred with the assistant district attorney:

"[PROSECUTOR]. Obviously, you have a lot more experience in investigating things than any of us do. And obviously, you got a tremendous amount of information that you have been working on and a—

. . . .

"[PROSECUTOR]. What would be your suggestion as far as things that we can look into or direction that you think that we should take? . . .

"[DELANEY].  . . . In all seriousness, obviously, I have kept a file open for a long time for a reason.

. . . .

"The Rod Turner thing, I got to tell you guys, there has got to be an answer to why is he getting paid the money that he's getting paid. We're being told by many, many people that he's not doing nothing. Whether that's filing false claims, I think you need to seriously look at it. . . . I think you ought to bring Rod Turner in. I don't think that he will talk. I don't know."

After Delaney relayed his thoughts to the grand jury on where they should focus their investigation and explained that the grand jury only had a limited time to act, a grand juror again brought up the Chuck Thompson murder:

> "419001: In your heart you mentioned the murder at Jalisco. In your heart, do you think there is any kind of relationship here?
>
> "A. As I told you the first time I testified or when I testified about that issue, some of the same names in that case are coming up today. I will leave it at that. Murder is—there is never a statute of limitations and I have been working on it for 20 years and, you know, sometimes people get in a bind and get charged or indicted and they want to cooperate. Sometimes that will help us. I always look for that road too.
>
> "419001: That is still open?
>
> "A. Yes, it is very open.
>
> "419001: If something comes out of this you can charge somebody?
>
> "A. If something would come out of this or I mean, I actually think I know who did it and why, but to present it to 12 people, I don't know that we're ready, so."

In response to the question of whether he believed that Reardon was credible, Delaney responded by again tying Turner to the murder case:

> "And I mean you hear something about Rod Turner. You just don't go to Rod Turner and say 'Hey, is this true?' Because, you know, I told you we tried talking to him on another case and he didn't see a need to talk to us, so I'll be shocked if he comes in and talks to you. Does that answer the question?"

Two sessions later, on April 30, 2008, Delaney provided another update to the grand jury and again referenced Turner's connection to the Thompson murder in explaining Turner's relationship with a possible witness.

> "And actually I think a surveillance report I did probably on the Chuck Thompson murder case—again keeping—trying to keep track of some of these people, I think he

9

was seen with Rod Turner and Pat Scherzer out at an I-Hop or something out at the Kansas Speedway."

The grand jury subpoenaed Turner to appear and testify at its session scheduled for June 25, 2008. Turner's attorney sent a letter to the DA objecting to Turner's appearance before the grand jury based upon Turner's privilege against self-incrimination under the Fifth Amendment to the United States Constitution and invoking the attorney/client privilege with respect to his representation of BPU. The record is silent on whether any effort was made to obtain a waiver of the attorney/client privilege from BPU, and the grand jury refused to release Turner from the subpoena.

Immediately before Turner was called to testify, a district judge appeared before the grand jury and announced that he was there to give the grand jury additional instructions, copies of which would be provided for the jurors. Interestingly, the instruction referred to "[t]he *defendant's* invocation of his Fifth Amendment Right," even though, as the Court of Appeals noted, Turner was not technically a defendant at that point. (Emphasis added.) The recitation of the instruction was as follows:

> "Comes now the Court and by way of additional instructions to the Grand Jury does state as follows: The defendant's invocation of his Fifth Amendment Right. A person properly summoned before the Grand Jury is required to appear as a witness for purpose of giving testimony. No witness before the Grand Jury shall be required to incriminate the witness' self.
> "If any witness appearing before the Grand Jury refuses to testify or to answer any questions asked in the course of the witness' examination, the facts shall be communicated to a district judge of the judicial district in writing on which the question refused to be answered shall be stated.
> "The judge shall then determine whether the witness is bound to answer or not. And the Grand Jury shall be immediately informed of that decision. The Grand Jury shall not draw any inference of guilt from the fact that a defendant does not testify or refused

10

to answer particular questions. You must not consider these facts in arriving at your decision regarding any indictment.

"These additional instructions to the Grand Jury must be considered in conjunction with the Grand Jury instructions and charges which you've already received. All instructions provided must be given equal weight in consideration during your deliberations.

"These additional instructions to the Grand Jury, presented to the Grand Jury this 25th day of June, 2008. Signed by myself at this time."

The district judge left the jury room after delivering the additional instruction. Then, prior to questioning Turner, the DA advised him of his statutory rights: "No. 1 is you have the right to not incriminate yourself. And No. 2, that you have the right to counsel." The DA then noted for the record that Turner had availed himself of the right to counsel, who was present. Turner's counsel then made a record of certain matters, including the June 19 letter he sent to the DA, raising objections to the proceedings and to Turner's appearance at the proceeding. The attorney noted that the DA had been advised that Turner would invoke his rights under the Fifth Amendment. Additionally, counsel referred to the American Bar Association rules concerning prosecutors calling witnesses before the grand jury who are the subject of the investigation and recited the special responsibility of a prosecutor under Kansas Rules of Professional Conduct (KRPC) 3.8(e) (2013 Kan. Ct. R. Annot. 614) to "not subpoena a lawyer in a grand jury . . . to present evidence about a past or present client" except under limited circumstances. The attorney also requested the DA to instruct the jury that no adverse inference could be drawn from Turner's assertion of his Fifth Amendment right, to which the DA replied that the grand jury had been "so instructed by Judge Lampson."

The DA then commenced upon a course of plethoric questioning that elicited over 100 identical successive responses from Turner in which he refused to answer on the grounds that it may tend to incriminate him, *i.e.*, in which he invoked the statutory right

of which the DA had just advised him. Many, if not most, of the DA's questions were leading questions that may have suggested to the jurors what the DA believed the facts to be. The DA did not communicate in writing with the district judge about Turner's refusal to testify or about the questions Turner refused to answer, as the district judge's additional instructions had directed.

The DA then invited the jurors to join in, and one of the grand jurors asked four pointed questions, all of which elicited the same response from Turner:  "I refuse to answer on the grounds it may tend to incriminate me." The DA jumped back in to ask eight more unanswered questions before another grand juror concluded the one-sided interrogation of the nonresponsive witness by asking:  "As a citizen of Wyandotte County don't you think in your opinion that we ought to know as citizens where our money is going?" The jurors, like the DA, failed to communicate in writing with the district judge as he had just finished instructing them to do.

When Delaney next appeared before the grand jury, on July 30, 2008, he suggested an adverse inference might be drawn from Turner's exercise of his constitutional and statutory right against self-incrimination because if Turner were innocent he would have shown the grand jury proof. Specifically, in response to the question from ADA Gray as to what had raised red flags or were big things for the investigator, Delaney responded:

> "The consulting is an issue. I think the outside counsel is an issue. . . . The Rod Turner to me is just so blatant. I mean, I can't explain—I'm not a lawyer, but if he's got proof of what he's doing for the BPU why doesn't he show it to us, or why doesn't he show it to you. That's just an opinion of mine. I'm not a lawyer. I'm just a cop."

12

At that July 30 grand jury session, Delaney once again alluded to the Thompson murder case when testifying about statements obtained from Pat Scherzer, BPU's insurance agent and a close acquaintance of Turner, who had also been a one-time target of the grand jury investigation. Specifically, Delaney said:

"And also an interesting tidbit of information I thought was, he asked about me, the KBI being involved in the BPU case, and that we were trying to use the BPU case to solve the Chuck Thompson murder. If you remember that's the politician that was killed in 1987.

"And apparently Mr. Scherzer thought supposedly thought that we were writing a book about it. And that's the farthest thing from the truth. But anyway—it's interesting that he's concerned about this case, and then all of a sudden he's interested in the Chuck Thompson murder. So just a little tidbit for your information."

Delaney next testified on August 13, 2008, and again discussed Scherzer's alleged statements that Delaney was using the BPU case to help solve the Thompson murder and that Delaney was going to write a book about solving the case. Delaney declared:

"Well, that ain't happening. I ain't writing a book. It is happening, we are trying to solve the Chuck Thompson murder. When there's individuals involved in that murder and if their names came up in this case, so be it. That's the way it goes. By the way, I'm not writing a book."

Delaney also testified about conversations that an attorney, who was representing BPU Board members before the grand jury, had with District Attorney Gorman about Delaney's use of the grand jury proceedings to solve the Chuck Thompson murder. Delaney related:

"Yesterday Jerry Gorman, your district attorney, said Tom Bath, who is representing the Board of Public Utilities board members, apparently has been approached by some board member, their concern that Bill Delaney asking BPU people connected—people

13

connected to the BPU case, this case, that I'm asking them questions about the Chuck Thompson murder. That apparently concerns them for some reason. I don't know why.

"But I guess they don't like people with BPU or somehow involved in a murder, you know, they are concerned about that. And they were apparently asking—this board member or board members thought that they should go to my supervisor and complain.

"Mr. Bath said, let me talk to Mr. Gorman and see what's going on. Mr. Gorman advised me of this yesterday. I don't know when that conversation took place. I don't care when it took place. I've called my bosses and told my bosses—I have two. I have an assistant director in Topeka. I called him and actually the director of the KBI.

"I said, just to let you know, you may be getting a complaint on me but—you may be getting a complaint on it, but just to let you know it's going to happen and that I don't really care. And I want to be right up-front about that."

The grand jury returned a sealed indictment charging Turner with 2 counts of theft and 55 counts of presenting a false claim arising from Turner's submission of invoices that were not itemized. Conklin, BPU's general counsel who had approved Turner's invoices, was also indicted for 2 counts of theft and 55 counts of allowing a false claim, albeit he died prior to being prosecuted. No other individuals were indicted, and none of the actual specific allegations in the petition used to convene the grand jury was the basis for any criminal charge.

Turner filed a motion to dismiss the indictments for grand jury abuse and violation of his constitutional rights. He complained about the grand jury's requirement that he appear and invoke his Fifth Amendment privilege after each of the hundred-plus questions. Turner also argued that he was unduly prejudiced by Delaney's frequent references to his alleged connection to the Thompson murder. After conducting a hearing on the motion, the trial court determined that Turner's "rights were prejudiced by the grand jury abuses and the State's violation of his Constitutional rights," and the court sustained Turner's motion to dismiss the indictment after specifically finding that:

"1. The State and its investigative officer undermined the grand jury process and deprived Mr. Turner of due process and his Fifth Amendment rights.

"2. The grand jury was repeatedly subjected to unsupported statements concerning the murder of Chuck Thompson, which occurred over twenty years ago. The murder was irrelevant to the alleged [BPU] violations that the grand jury was charged with investigating, but the State allowed information and speculation about the murder to be thrust into the hands of the grand jury proceeding.

"3. While testifying before the grand jury, the State's investigator attempted to link Mr. Turner to the murder or at least give the illusion that he was somehow connected thereto. This was highly improper and prejudicial and his comments tainted the grand jury and violated . . . Mr. Turner's rights of due process.

"4. The State caused Mr. Turner to appear before the grand jury even though it knew that he would exercise his Fifth Amendment rights and that he would not waive his attorney-client privilege held by his relationship with the BPU.

"5. During the grand jury proceeding, the State's investigator was permitted to cast doubt on Mr. Turner's constitutional rights by commenting that Mr. Turner should come forward with information about the Thompson murder and about his dealings with the BPU.

"6. The State failed to conduct a fair grand jury proceeding and allowed information to be presented to the grand jury in a manner that caused the grand jury to become prejudiced against Mr. Turner."

The State appealed the indictment dismissal to the Court of Appeals, which reversed the district court's decision. *State v. Turner*, 45 Kan. App. 2d 744, 250 P.3d 286 (2011). The Court of Appeals first considered the district court's determination that Turner's Fifth Amendment rights had been violated. The panel found that the district court had applied an incorrect legal standard in determining that the prosecutor had violated Turner's Fifth Amendment right against self-incrimination because, in the panel's opinion, a witness may be required to appear before the grand jury and assert his or her Fifth Amendment rights on a question-by-question basis. 45 Kan. App. 2d at 754. The panel did find that Delaney had violated Turner's constitutional right to remain silent in

15

testimony given after Turner had invoked that right, but the panel determined that Turner had not shown that he was prejudiced by that constitutional error. 45 Kan. App. 2d at 756.

Next, the panel found "that it constituted an abuse of discretion for the district court to find that the State 'failed to conduct a fair grand jury proceeding' without reading all the transcripts of the entire grand jury proceedings." 45 Kan. App. 2d at 757. Nevertheless, the panel embarked upon its own review of the entire record and discovered that Delaney had made "multiple references to his involvement in the Thompson murder investigation" and that "[a]ll of these references were irrelevant and unnecessary to the grand jury's investigation of Turner and the BPU." 45 Kan. App. 2d at 758. But the panel held that, because the errors occurred as isolated episodes over the course of a 6-month investigation and because substantial evidence was presented before the grand jury to support probable cause for Turner's indictment, "it seems unlikely that Delaney's improper testimony had 'a substantial effect on the grand jury's decision' to indict Turner." 45 Kan. App. 2d at 764 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S. Ct. 2369, 101 L. Ed. 2d 228 [1988]). Moreover, the panel proffered the alternative justification that "Turner's constitutional rights can be protected at trial." 45 Kan. App. 2d at 764.

Turner petitioned for review of the Court of Appeals decision, in part complaining that the Court of Appeals disregarded the abuse of discretion standard of review "by wholly substituting its own decision for that of the District Court" and that the panel essentially abolished important constitutional rights in grand jury proceedings. Turner argues that the district court's determination that the State violated Turner's Fifth Amendment and due process rights by conducting improper and prejudicial grand jury proceedings was supported by at least three State actions: (1) The DA required Turner to repeatedly invoke his Fifth Amendment right to remain silent over 100 times in the

16

presence of the grand jury, after being advised beforehand that Turner would invoke that constitutional and statutory right; (2) the State's chief investigator impermissibly commented on Turner's invocation of his Fifth Amendment right to remain silent after Turner had been called as a witness; and (3) the State's chief investigator repeatedly testified about, and linked Turner to, an unrelated murder. We agree on all counts.

DISMISSAL OF GRAND JURY INDICTMENT

Although the Court of Appeals reversed the district court's dismissal of Turner's indictment, the panel did not do so because the proceedings were free of error. To the contrary, the panel found Delaney's multiple references to the Thompson murder to be "irrelevant and unnecessary" to the grand jury inquiry and ultimately labeled that portion of the State's evidence as "Delaney's improper testimony." 45 Kan. App. 2d at 758, 764. The State did not seek review of that portion of the Court of Appeals' decision. Likewise, the panel found constitutional error in Delaney's comments on Turner's exercise of his right to remain silent. Again, the State has not asked us to reverse that Court of Appeals holding.

Accordingly, the disposition of this review will hinge upon the question of whether the irregularities and improprieties in the grand jury proceedings already determined by the courts below justified the district court's dismissal of the ensuing indictment. En route to that determination, we will review the Court of Appeals' assessment of the nature and extent of grand jury abuses in this case.

*Standard of Review*

The Court of Appeals declared that it was utilizing an abuse of discretion standard to review the district court's dismissal of Turner's indictment. *Turner*, 45 Kan. App. 2d at 749-50. The panel relied in part upon its determination that the district court had used an

17

incorrect legal standard and in part upon its determination that the entire record did not support the lower court's holding. We have clarified that both legal and factual infirmities can form the basis for an abuse of discretion:

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.] In some cases, this three-part standard may narrow the broad discretion previously allowed when this court routinely applied only the no-reasonable-person-would-take-the-same-view standard. [Citation omitted.]" *State v. Ward*, 292 Kan. 541, 550-51, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Within that context, where we are called upon to determine whether constitutional rights have been violated, we review the district court's factual findings for substantial competent evidence, but the ultimate legal conclusion is reviewed as a question of law utilizing an unlimited standard of review. *State v. Bell*, 280 Kan. 358, 362, 121 P.3d 972 (2005). In addition, whether a defendant's due process rights are violated is a question of law over which this court exercises de novo review. See *State v. Kirkpatrick*, 286 Kan. 329, 351, 184 P.3d 247 (2008).

*Analysis*

The Court of Appeals began by discussing Turner's Fifth Amendment rights, albeit those guarantees are actually enforced against state actions through the Fourteenth Amendment of the United States Constitution. See *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Nevertheless, to avoid confusion, we will continue the panel's reference to Fifth Amendment rights. The part of that amendment that is relevant to our inquiry reads as follows:  "[N]or shall [any person] be compelled in any Criminal

Case to be a witness against himself." U.S. Const. amend. V. Further, we would also note in passing that our state constitution contains a privilege against self-incrimination as well. Kansas Constitution Bill of Rights, § 10.

Moreover, the right to remain silent is a deep-rooted, fundamental privilege. It is universally applicable to protect an individual from being compelled to answer "official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973). Clearly, then, the constitutional right against self-incrimination was available to protect Turner from being compelled to answer official questions put to him by the prosecutor at a grand jury proceeding where the answers might incriminate Turner in a future criminal proceeding, such as one arising from an indictment by the grand jury before which he was testifying. Indeed, K.S.A. 22-3008(4) specifically codifies the constitutional right for grand jury proceedings:  "No witness before a grand jury shall be required to incriminate the witness' self." Any suggestion that the constitutional right was somehow diluted or diminished because a grand jury is an investigatory proceeding rather than a criminal action ignores the purpose of the privilege.

*State's Questioning*

The first Fifth Amendment issue addressed by the panel was Turner's complaint that the DA should not have made him invoke his right against self-incrimination over 100 times in front of the grand jurors. The Court of Appeals relied heavily upon *In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 475, 932 P.2d 1023 (1997), where a Court of Appeals panel opined that pursuant to statutory language and interpretive caselaw, "a person called as a witness in an inquisition under K.S.A. 22-3101 *et seq.* is not provided blanket immunity from answering questions, and the district court

19

correctly required the witness to assert a Fifth Amendment right on a question-by-question basis." The panel in this case declared: "Due to the similarities between an inquisition and a grand jury proceeding, the analysis of a witness' Fifth Amendment rights in the context of an inquisition is applicable to a grand jury proceeding as well." *Turner*, 45 Kan. App. 2d at 752. We reject that premise because the inquisition analogy is fallacious.

While inquisitions and grand jury proceedings share some common procedural statutes, they are pointedly different in the areas impacting the protection of an individual's constitutional rights. First, and foremost, an inquisition does not involve any nonlawyers; layperson jurors are not in charge of an inquisition. Compare K.S.A. 22-3101 with K.S.A. 22-3001(3). A prosecuting attorney applies to a judge to conduct an inquisition, and the judge is charged with issuing subpoenas. K.S.A. 22-3101(1). In the course of the inquisition, the judge has the hands-on responsibility to prevent the prosecutor from abusing the judicial process. See *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 918, 128 P.3d 364 (2006). Upon completion of the inquisition, nothing happens until the prosecuting attorney exercises his or her professional judgment and discretion to file a complaint. See K.S.A. 22-3103.

The absence of nonlawyers participating in an inquisition is important for a number of reasons, not the least of which is that the prosecutor has no one to improperly influence by asking numerous leading questions to a witness invoking Fifth Amendment rights. Pointedly, *T.H.* did not even address whether requiring a question-by-question invocation of Fifth Amendment rights could be prejudicial to those rights, presumably because none of the participants at an inquisition should be confused about the meaning of such a refusal to answer. In contrast, a layperson would naturally intuit that a person refusing to answer on the grounds that it might incriminate the witness is simply trying to hide his or her guilt. If the witness has nothing to hide, why doesn't the witness just

20

answer the questions? KBI Agent Delaney would put that thought into the heads of these grand jurors.

Moreover, both the prosecutor and the presiding judge at an inquisition are subject to rules of professional conduct, as well as having taken an oath of office to uphold the law, including our constitutions. Although lay grand jurors also take an oath, failure to comply does not put their professional livelihood at risk.

Further, the disposition in a grand jury differs significantly from the purely investigative function of an inquisition. In the event that the State's law-trained representative exercises his or her prosecutorial discretion and files a criminal complaint based upon information gleaned during an inquisition, the defendant still has a right to a probable cause determination under the Fourth Amendment to the United States Constitution and a Kansas statutory right to a preliminary hearing. See *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) ("the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest"); K.S.A. 22-2902(1) (preliminary hearing procedures).

In stark contrast, the endgame for a grand jury is to issue an indictment upon the concurrence of 12 of the 15 jurors. K.S.A. 22-3011. In that event, no further test for probable cause is required and the indicted defendant is not entitled to a preliminary hearing. See *State v. Clemons*, 261 Kan. 66, 68, 929 P.2d 749 (1996). In *Vasquez v. Hillery*, 474 U.S. 254, 263, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986), the United States Supreme Court held that the intentional discrimination in grand jury selection is a grave constitutional trespass and, en route to that holding, the Court recognized that a grand jury's power transcends mere investigation:

21

"Nor are we persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from that grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts."

Granted, a grand jury does not determine the guilt or innocence of a defendant, like a petit jury, but the consequences of a grand jury indictment are serious. See K.S.A. 22-3011(3) ("Indictments found by the grand jury shall be presented by its presiding juror, in the jury's presence, to the court and shall be filed and remain as records of the court."). Moreover, the need to protect an accused individual's constitutional rights before factfinders who are not trained in the law and consequently do not know and understand those constitutional rights is precisely the same with a grand jury as it is with a petit jury.

Finally, although the Court of Appeals pointed out similar statutory provisions relating to inquisitions and grand juries, it overlooked some significant textual differences. Specifically, K.S.A. 22-3008 deals with immunity for grand jury witnesses and provides, in relevant part:

"(3) If any witness appearing before a grand jury *refuses to testify or to answer any questions* asked in the course of the witness' examination, the fact shall be communicated to a district judge of the judicial district in writing, on which the question refused to be answered shall be stated. The judge shall then determine whether the witness is bound to answer or not, and the grand jury shall be immediately informed of the decision." (Emphasis added.)

The disjunctive—refuses to testify *or* to answer any questions—certainly suggests that "any witness" has the option of refusing to provide *any* testimony before a grand jury

22

until a judge orders otherwise, rather than having the sole choice of refusing to answer question-by-question. No similar provision is found in the inquisition statutes. Instead, those statutes provide that a witness may not be compelled to self-incriminate, but the witness may be judged in contempt of court if he or she refuses to answer any "proper question propounded during the inquisition." K.S.A. 22-3101(3).

Turner suggests that he should not have been required to appear before the grand jury at all after his attorney advised the DA that Turner would invoke his Fifth Amendment rights. But we need not wrestle with that question here. Turner appeared before the grand jury and clearly invoked his constitutional and statutory rights against self-incrimination, and the DA failed to follow the procedure set forth in K.S.A. 22-3008(3). The DA did not communicate in writing to the judge that Turner refused to testify and then await direction from the court. Instead, the DA chose to ask a hundred plus questions, knowing that Turner could not refute the substance of the questions without waiving his Fifth Amendment right to remain silent. An example of the DA's tactics follows:

"Q. Was Marc Conklin just submitting the bills to the BPU for Rodney L. Turner?

"A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. Did you and Mr. Conklin discuss this matter ahead of time?

"A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. The monies that you've received, some $411,000 or $412,000 for the period of 2003 through March of 2008, did you share those monies with anyone else?

"A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. Were those monies received for legal services?

"A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. Can you name one legal service you performed for the Board of Public Utilities?

"A. I refuse to answer on the grounds it may tend to incriminate me."

23

By that ploy, the DA could suggest to the grand jury what the State believed the facts to be. And perhaps more damning, the questioning could create the impression that for each and every question that Turner refused to answer, he must have something to hide. In *State v. Crumm*, 232 Kan. 254, Syl. ¶ 1, 654 P.2d 417 (1982), where the defendant attempted to call as a witness a potential suspect in the case whose counsel had advised that the witness would claim her Fifth Amendment rights, this court clarified that "[i]t is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege." The *Crumm* Court expanded on the reasons behind that prohibition:

> "'Further, a witness's reliance on the Fifth Amendment "may have a disproportionate impact upon the minds of the jurors." [Citation omitted.] "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality, the probative value of the event is almost entirely undercut by the . . . fact that *it is a form of evidence not subject to cross-examination.*" [Citation omitted.] Because *the impact of a witness's refusal to testify outweighs its probative value,* "[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." [Citations omitted.]'" (Emphasis added.) 232 Kan. at 260 (quoting *Com. v. Hesketh*, 386 Mass. 153, 157, 434 N.E.2d 1238 [1982]).

It is difficult to discern how a grand juror would be immune to those adverse consequences from which we scrupulously protect a petit juror. Granted, here, the district judge had instructed the grand jury that it was not to draw any adverse inference from Turner's invocation of his Fifth Amendment privilege. But the DA's incessant and probing questioning sent an entirely different message. We know from the record that at least some of the jurors received the DA's message loud and clear, as demonstrated by the

24

jurors' pointed questions to Turner, including one juror's manifestation of bias against Turner: "As a citizen of Wyandotte County don't you think in your opinion that we ought to know as citizens where our money is going?" In other words, the district court's admonition to the grand jurors to refrain from drawing any adverse inference from Turner's invocation of his Fifth Amendment rights did not survive to the end of the State's questioning, and the DA did nothing to correct the questioning jurors or to reinforce the district judge's admonition.

Additionally, the questioning went beyond creating inferences or suspicions with regard to the padded invoices allegations being investigated. For instance, the DA referred to a letter in which the correspondent had copied the Disciplinary Administrator and then inquired: "Can you explain to me what that was about?" Of course, the DA knew that Turner had to leave the suggestion of unethical conduct dangling before the jurors without a response. Similarly, the DA inquired about some real estate investments, intimating that Turner, Conklin, and others were in cahoots on some shady deals.

But the DA did not do all of the damage by himself. The prosecutors permitted, if not aided and abetted, Delaney to encourage the grand jury to call Turner as a witness and to suggest to the jurors that Turner should be willing to tell them what he did to justify the invoices. Then, after Turner appeared and refused to testify, the prosecutors permitted Delaney to again tell the jurors that Turner should prove what work he had been performing for BPU. The jurors did not have to draw adverse *inferences* from Turner's refusal to testify because the State's chief investigator outright told them that Turner was wrong to invoke his constitutional right to remain silent.

Accordingly, we agree with the district court that the DA's persistent questioning of Turner, after learning that he was invoking his Fifth Amendment right against self-incrimination, was improper and would provide at least part of the justification for

25

dismissing the resulting indictment. We reverse the Court of Appeals' holding to the contrary.

*Comment on Silence*

Next, the panel addressed the district court's holding that "'[d]uring the grand jury proceeding, the State's investigator was permitted to cast doubt on Mr. Turner's constitutional rights by commenting that Mr. Turner should come forward with information about the Thompson murder and about his dealings with the BPU.'" *State v. Turner*, 45 Kan. App. 2d 744, 754, 250 P.3d 286 (2011). Curiously, the panel first opined that "there is no direct legal authority for the proposition that a comment by a witness to a Kansas grand jury about another witness' silence at a grand jury is improper, much less a violation of constitutional rights." 45 Kan. App. 2d at 756. But then the opinion summarily declares that "Delaney's comment on Turner's refusal to testify, after he had expressly invoked his right to remain silent, violated his constitutional rights under the Fifth Amendment." 45 Kan. App. 2d at 756.

We agree with the panel's conclusion, and we find support in the rationale behind *Doyle v. Ohio*, 426 U.S. 610, 619-20, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and its progeny for prohibiting the State from using a witness' silence for impeachment purposes at a grand jury proceeding. *Doyle* and its progeny are founded upon the notion that it is fundamentally unfair to advise a person that he or she has the right to remain silent and then impeach that person with the fact that he or she exercised the right. Turner had both a constitutional and statutory right to remain silent when called before the grand jury, and the prosecutor dutifully advised Turner of that right. When the State's chief investigator, Delaney, suggested to the grand jury that it should draw an adverse inference from Turner's failure to explain his billing invoices and the prosecutor did nothing to correct that impropriety, the State violated the Due Process Clause of the Fourteenth

26

Amendment. *Cf. Doyle*, 426 U.S. at 619; *State v. Mims*, 220 Kan. 726, Syl. ¶ 1, 556 P.2d 387 (1976). Where we part company with the Court of Appeals is when it opines that Turner had the burden and failed to prove that the State's constitutional violation prejudiced him. We will discuss the harmlessness of the various errors below.

*Abuse of the Grand Jury Process*

In dismissing the indictment, the district court made the additional finding that the "State failed to conduct a fair grand jury proceeding and allowed information to be presented to the grand jury in a manner that caused the grand jury to become prejudiced against Mr. Turner." That finding was based upon Delaney's repeated references to the 1987 Thompson murder, intimating that Turner had information about that crime and suggesting that indicting Turner on the false claims and theft charges could help the KBI agent solve the murder case.

The panel reviewed the abuse of process complaint as a matter of due process. Citing to a quarter-century old Wyoming case, *Hennigan v. State*, 746 P.2d 360 (Wyo. 1987), the Court of Appeals rejected the notion that due process rights attach in a grand jury proceeding in the same manner as in a criminal trial. *Turner*, 45 Kan. App. 2d at 760. But the panel did not explain what process Turner was due in these proceedings, opting instead to decide that Turner was not prejudiced by the improper testimony in the grand jury proceeding and, without prejudice, due process rights are not deemed to be violated. 45 Kan. App. 2d at 764.

The Fifth and Fourteenth Amendments to the United States Constitution protect an individual's due process rights and prohibit the deprivation of a significant life, liberty, or property interest. *Hudson v. State*, 273 Kan. 251, 259, 42 P.3d 150 (2002). Obviously, the target of a grand jury investigation has a significant liberty interest at stake and is entitled

to due process protection. The essence of due process is fairness between the State and the individual dealing with the State. See *Chiles v. State*, 254 Kan. 888, 902, 869 P.2d 707 (1994). "A State's decision regarding the administration of justice is subject to proscription under the Due Process Clause of the Fourteenth Amendment to the United States Constitution if '"it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Citations omitted.)'" *State v. Bethel*, 275 Kan. 456, 461, 66 P.3d 840 (2003) (quoting *Patterson v. New York*, 432 U.S. 197, 201-02, 97 S. Ct. 2319, 53 L. Ed. 2d 281 [1977]).

Our grand jury statutes provide some insight into the due process requirements in such proceedings. For instance, K.S.A. 22-3002(2) permits dismissal of an indictment based upon an objection to the "array or on the lack of legal qualification of an individual juror," suggesting that a target of an investigation is entitled to a grand jury free from discrimination. See *Vasquez*, 474 U.S. at 263. K.S.A. 22-3003, which governs the grand juror's oath, specifically provides that grand jurors are required to be fair and impartial. See also *State v. Chong*, 86 Hawaii App. 290, 293, 949 P.2d 130 (1997) (In Hawaii, constitutional due process requires a fair and impartial grand jury proceeding.). But most importantly for our purposes here, the grand juror's oath directs that the juror is to base the indictment on "legal evidence." K.S.A. 22-3003. Legal evidence has been defined as "[a]ll admissible evidence, both oral and documentary, of such a character that it reasonably and substantially proves the point rather than merely raising suspicion or conjecture." Black's Law Dictionary 598 (8th ed. 2004).

Thus, our statutes contemplate that due process mandates that a Kansas grand jury should only issue an indictment based on legal evidence, rather than suspicion or conjecture. See also *People v. Backus*, 23 Cal. 3d 360, 393, 152 Cal. Rptr. 710, 590 P.2d 837 (1979) (When the extent of incompetent and irrelevant evidence before the grand jury is such that, under instructions and advice given by the prosecutor, it is unreasonable

28

to expect that the grand jury could limit its consideration to admissible, relevant evidence, defendants have been denied due process.). But *cf. Bracy v. United States*, 435 U.S. 1301, 1302, 98 S. Ct. 1171, 55 L. Ed. 2d 489 (1978) (while presentation of inadmissible evidence at trial may pose substantial threat to integrity of factfinding process, its introduction before grand jury poses no such threat).

Here, the irrelevant and unnecessary evidence of Turner's involvement in or knowledge of the unrelated Thompson homicide was more than extraneous clutter that the jurors had to wade through. Delaney presented that evidence as part of the basis upon which the grand jury should indict on the padded billings charges, *i.e.*, so that the agent could coerce Turner's cooperation to solve the murder case. Certainly, then, where the indictment is potentially *based* on irrelevant evidence, the process has not attained the fundamental fairness required by due process protections. We have no problem labeling as a due process violation Delaney's irrelevant and unnecessary testimony about the Thompson murder case, which was sponsored, or at least enabled, by the prosecutors.

*Dismissal of the Indictment*

To review, we have identified the following errors in the grand jury proceedings: (1) The DA violated Turner's Fifth Amendment right against self-incrimination by asking him numerous questions in front of the grand jury which required him to invoke the privilege over 100 times; (2) the State's chief investigator for the grand jury impermissibly commented on Turner's silence in violation of his Fifth Amendment right against self-incrimination; and (3) the State-sponsored testimony of the chief investigator violated Turner's due process rights by introducing irrelevant and unnecessary evidence about an unrelated murder case and suggesting that the grand jury should indict on the present case to help solve the prior murder case. Our final step is to determine whether those errors warranted a dismissal of the indictment.

Before proceeding, we pause to briefly address the Court of Appeals' declaration that the district court erred in not reading the entire grand jury transcript before ruling that the egregious errors pointed out by Turner were prejudicial. Pointedly, the panel did not identify what portions of the unread transcript provide an excuse or cure of the constitutional violations pointed out by the defense. Moreover, as the panel pointed out, the entire transcript is provided on appeal and the State is free to point out to us those portions of the transcript that favor the State's position.

Although the Court of Appeals found a constitutional violation, it placed the burden on Turner to establish that the errors were prejudicial. *Cf. State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (burden to show harmless error on party benefiting from the error; constitutional violations require greater degree of certainty of harmlessness). Relying on *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), the panel held that, given the existence of substantial competent evidence in the record to support the indictment, Turner had failed to meet his burden of establishing prejudice. *Turner*, 45 Kan. App. 2d at 764. We disagree with several aspects of the panel's holding.

Our first disagreement is with the panel's placing the burden of proof on Turner to establish that the constitutional violations committed by agents of the State were not harmless error. The district court ruled in favor of Turner and the State appealed, acknowledging that errors occurred in the grand jury proceedings which would have caused a reversal of a trial verdict but arguing that the errors were harmless in the context of this grand jury proceeding. The State needed to prove its theory of appeal; Turner was not required to prove the fallacy of the State's argument. Moreover, since *Ward*, we have consistently placed the burden of proving harmlessness upon the party that benefitted from the error.

Next, we do not read the Supreme Court's holding in *Bank of Nova Scotia* as supporting the proposition for which the panel uses it. Nowhere in the opinion did the *Bank of Nova Scotia* Court declare that the existence of sufficient evidence to support an indictment renders harmless any and all errors in the proceedings, as a matter of law. To the contrary, the issue presented in that case was whether "a district court may invoke its supervisory power to dismiss an indictment for prosecutorial misconduct in a grand jury investigation, where the misconduct does not prejudice the defendants." 487 U.S. at 252. In answering the prejudice question, the Supreme Court looked at the effect of the violations on the decision-making process, rather than considering whether the evidence was sufficient without the errors. Specifically, the Supreme Court applied a nonconstitutional harmless error standard, which it stated as follows:

> "[T]he District Court had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct. The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict. If violations did substantially influence this decision, *or there is grave doubt that the decision to indict was free from such substantial influence*, the violations cannot be deemed harmless." (Emphasis added.) 487 U.S. at 263.

Certainly, if nonconstitutional violations cannot be deemed harmless where there is grave doubt that the decision to indict was free from the substantial influence of the errors, constitutional violations cannot be deemed harmless under that standard. The substantial influence of the State's violations is readily apparent in the record before us, creating grave doubt about the efficacy of the indictment, *i.e.*, the *Bank of Nova Scotia* test has been met in this case.

Although the Court of Appeals applied its own test for prejudice, we nevertheless take issue with the panel's rationale for finding no prejudice. For instance, the panel

31

declared that the alleged errors "occurred as isolated episodes over the course of a 6-month investigation involving at least 27 witnesses and 97 exhibits." *Turner*, 45 Kan. App. 2d at 761-62. That declaration cannot stand up to closer factual scrutiny. While the time span between the grand jury's first meeting on March 5, 2008, and its last meeting on August 27, 2008, is almost 6 months on a calendar, the grand jury was in session on only 17 days during that time span. In other words, describing the grand jury proceedings as a 2 1/2-week investigation appears more accurate than calling it a 6-month investigation. And within that shorter time frame, Delaney's erroneous presentation of the irrelevant and unnecessary evidence of the unrelated murder case played a relatively major role in the proceedings, when compared to the other witnesses and exhibits to which the panel alluded. The KBI agent appeared before the grand jury on 10 of the 17 days it was in session, *i.e.*, over 1/2 of the days the jury met, it was exposed to the influence of Delaney. None of the other witnesses came close to dominating the jury's time in such a fashion. On 6 of those days in which Delaney testified, *i.e.*, over 1/3 of all of the sessions, the KBI agent improperly and unconstitutionally attempted to connect Turner to the Thompson murder. "Pervasive" more accurately describes the frequency of errors; they were certainly not "isolated."

Moreover, ADA Gray signaled the jury as to the weight it should give to Delaney's testimony, as compared to the other witnesses, when she inquired of the agent as follows: "Obviously, you have a lot more experience in investigating things than any of us do. And obviously, you got a tremendous amount of information that you have been working on and a— . . . What would be your suggestion as far as things that we can look into or direction that you think that we should take?" Accordingly, the KBI agent's suggestions that the jurors needed to indict Turner on the false claims and theft charges in order to permit the agent to solve a murder case would have been compelling for a lay juror in that context. In other words, the errors would have substantially influenced the grand jury's decision to indict, if not compel such a result.

32

Against that backdrop, the State's remaining evidence pales in comparison. As the panel recited, the State presented witness after witness who testified that they did not know what work Turner did for BPU. One suspects that the prosecutors could have presented a couple of hundred thousand other people who could have also truthfully testified that they did not know what work Turner performed for BPU. To be clear, these witnesses did not testify that they had personal knowledge that Turner did not earn the amount he billed. They just did not know what he had done to earn it, in contrast to those witnesses that had personal knowledge that Turner did perform work for BPU, which the panel conveniently overlooked. Those witnesses included Board members John Petty, Loretta Colombel, and Mark Jones; Board secretary Terry Edison; chief counsel for the Unified Government Hal Walker; and former BPU general manager Leon Daggett, who said he could discuss the business he transacted with Turner if BPU waived its attorney/client privilege. In sum, the only evidence supporting the indictment was Turner's unitemized bills, testimony from certain individuals who were unaware of the specific nature of work Turner did for BPU, and witnesses who refused to breach the attorney/client privilege in order to answer the grand jury's questions about what work was performed. Contrary to the Court of Appeals' belief, such equivocal nonproof testimony does not cure or trump the egregious errors visited upon these proceedings that polluted the process and denied fundamental fairness.

Consequently, we reverse the Court of Appeals and affirm the district court's dismissal of the indictment.

MORITZ, J., not participating.

33